UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSHUA HOWARD,

                Plaintiff,

v.                                                                      Case No. 18-cv-1830-pp

LINDA ALSUM-O'DONOVAN,
WILLIAM J. BAUER, SCOTT COOPER,
BRIAN FOSTER, WARDEN MICHAEL MEISNER,
ANTHONY MELI, WILLIAM J. POLLARD,
DONALD STRAHOTA, MICHAEL THURMER,
and JEREMY WESTRA,

                Defendants.

**ORDER SCREENING AMENDED COMPLAINT (DKT. NO. 12) AND DISMISSING CASE FOR FAILURE TO STATE A CLAIM**

Plaintiff Joshua Howard, an inmate at Green Bay Correctional Institution who is representing himself, filed a complaint alleging that the defendants violated his civil rights under 42 U.S.C. §1983 when they repeatedly failed to provide him medication for his depression, anxiety and insomnia. Dkt. No. 1. The court screened the complaint and concluded that the plaintiff had not provided the court with enough information to determine he had alleged that the named defendants' failure to change the medication distribution policy amount to deliberate indifference. Dkt. No. 9 at 8. The court gave the plaintiff a deadline of August 14, 2020 by which to amend the complaint to make more specific allegations. Id. at 10. The plaintiff moved for an extension of time, dkt. no. 10, which the court granted, extending the deadline to August 28, 2020, dkt. no. 11. The court received the amended

1

complaint on August 24, 2020. Dkt. No. 12.

## I. Federal Screening Standard

Under the Prison Litigation Reform Act (PLRA), the court must screen complaints brought by prisoners seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege

that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court liberally construes complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

## II. Allegations in the Amended Complaint

The amended complaint names ten defendants: Linda Alsum, William Bauer, Scott Cooper, Brian Foster, Michael Meisner, Anthony Meli, William Pollard, Donald Strahota, Michael Thurmer and Jeremy Westra. Dkt. No. 12 at §A.

The complaint alleges that since 2004, the plaintiff has been prescribed medication to treat depression, anxiety, and insomnia. Dkt. No. 12 at ¶(B)(2). He asserts that he has missed thousands of doses of medication "due to the Defendants' continued practice of having correctional officers dispense controlled medication, maintain the logs and order refills." Id. The plaintiff alleges that from 2004 through 2017, at "WCI," which the court infers is Waupun Correctional Institution,[1] the policy of having correctional officers

---

[1] The Wisconsin Department of Corrections inmate locator web site indicates that between July 2002 and October 13, 2017, the plaintiff was in custody at Waupun Correctional Institution. https://appsdoc.wi.gov/lop/detail.do.

3

Case 2:18-cv-01830-PP    Filed 12/14/20    Page 3 of 16    Document 13

distribute medications, maintain medication records and issue refill slips caused the plaintiff to go without medication 324 times and miss 4284 doses. Id. at ¶¶(B)(1-3). He says that over the years, the "hundreds of separate instances of abrupt unavailability of medication has caused the plaintiff to experience insomnia, migraine headaches, severe nausea, and a complete disruption of his well-being and mental health in addition to an exacerbation of his underlying symptoms of depression, insomnia and anxiety." Id. at ¶(B)(4).

The plaintiff asserts that DAI [Department of Adult Institutions] Policy 500.08.11 "allows for correctional staff to dispense controlled medication to inmates and requires that they receive pre-service training in medication delivery and annual refresher course." Id. at ¶(B)(5). According to the plaintiff, in the early 2000s, the Wisconsin Department of Corrections came under intense scrutiny for their handling of medication distribution. Id. at ¶(B)(21). He says that the DOC conducted a self-assessment in 2006 and determined "it was 'committed to developing a long-term, viable alternative to the practice of correctional officers distributing medications' and acknowledged that risk management was an ongoing concern due to officers' lack of clinical training." Id. at ¶(B)(24). The plaintiff alleges that "Defendants" were aware of this scrutiny and self-assessment. Id. at ¶(B)(25). The plaintiff also alleges that "[u]pon information and belief, Defendants were aware" of a 2006 class action where the court granted an injunction (in 2009) "which required all controlled medication at Taycheedah Correctional Institution to be distributed by trained medical personnel to remedy the serious risks associated with officer

4

administered medications." Id. at ¶¶(B)(26-28). The plaintiff asserts that despite these findings and court rulings, "Defendants continued the practice [of officer distributed medication] fully aware of the problems because the only remedy was to use nursing staff which would cost more." Id. at ¶(B)(29).

The complaint describes the basic process of medication distribution at WCI. It says that during medication delivery, "correctional officers assigned to the post of range officer are given baskets containing the medication cards for their range and a binder containing the relevant inmates' medication administration record where each dosage is documented on a DOC-3026 for the month after which it is placed in the inmates' permanent medical file." Id. at ¶(B)(6). The third-shift sergeant goes through the medication cards and submits refill slips to the health services unit for those cards that indicate there is less than a week's supply left. Id. at ¶(B)(7). An officer is responsible for filling out the medical log (the DOC-3026), and "the officer must fill in the applicable box with either his initials, denoting that the medication was delivered, an 'R' indicating that the medication had been refused or a 'U' indicating that the medication was unavailable." Id. at ¶(B)(8). "There are not supposed to be any boxes left blank." Id. When an inmate is to receive a medication, and the officer does not have it on his distribution cart, "the officer is supposed to confirm with the sergeant that the medication is not on the unit and if that's the case, the officer should contact HSU so the medication can be brought to the unit. Id. at ¶(B)(9). The plaintiff alleges that during the more than twelve years that he was prescribed medication at WCI, "this step was

5

never taken by correctional staff." Id.

The plaintiff asserts that he was locked in his cell when medication was delivered. Id. at ¶(B)(10). He alleges that he "was often told by the officer doing med pass that his medication was 'out' and that they would check in the sergeant's cage and if it was there, he or she would return." Id. The plaintiff states that "inevitably" the officer did not return and the plaintiff went without his medication. Id. The plaintiff alleges that on his charts from 2004 through 2015, where the officers were supposed to indicate whether he received his medicine, there were 2,459 boxes (the boxes where officers were supposed to document that medication was given, refused or unavailable) that were not filled in by staff. Id. at ¶(B)(13).

The plaintiff alleges that every time he filed an inmate complaint, the Inmate Complaint Examiner would contact the HSU manager, and the HSU manager would review the "relevant month's DOC-3026" to determine what the plaintiff's medical chart showed. Id. at ¶(B)(11). The Inmate Complaint Examiner would determine "that a refill slip had not been timely filled out by the third-shift, or more often, HSU would respond that based on when the last card of medication was sent, the plaintiff should be 'out' as was often evidenced by the fact that the medication would be available in the following days without a refill card having been sent." Id. Whenever the Inmate Complaint Examiner affirmed the plaintiff's complaint, he or she would send the complaint "to the Defendants who supervised the officers, cell halls and the medication process, so that they could follow up with third shift and/or remind the officers of the

6

proper procedures when the medication is not on their cart." Id. at ¶(B)(12). The plaintiff states "[u]pn information and belief, the Defendants failed to take any corrective action either because they did not take the delivery of medication to be a serious responsibility of correctional staff or they did not believe that any amount of follow-up would solve the inherent problems that came with using officers in this capacity." Id.

The plaintiff also alleges that he does not think the amount of training the officers receive is adequate. Id. at ¶(B)(16). He states that "pre-service training is approximately (280) hours long and covers several areas. Of that a total of (6) hours is relegated to an overview of the Health Service Unit and a portion of the (6) hours is spent on medication delivery and side effects." Id. at ¶(B)(15). He asserts that "[p]art of the pre-service training includes a Field Training Officer Module and checklist to document the officer's training in medication delivery." Id. at ¶(B)(17). The plaintiff says that he believes these forms are not in "the institution training file for each officer" because "the Field Training Officer failed to properly train the recruit and fill out the form." Id. The plaintiff notes that prior to 2014, "upon information and belief," there was no annual training for medication distribution, and that after 2013, the annual training consisted of a slide show that should take thirty minutes to review and absorb; he alleges that "correctional staff who bother to take it simply speed-click through the course finishing it in a fraction of the allotted time." Id. at ¶¶(B)(18-19). The plaintiff alleges that the fact that an officer either didn't take the training or "speed-clicked through it" is documented in the officer's training

7

records "which are readily available to Defendants yet no corrective action was taken to ensure that the officers take this part of their duty seriously and sincerely take in the follow up training." Id. at ¶(B)(20).

The plaintiff asserts that he filed nearly 100 medication-related complaints "and as a result the defendants were all contacted at various times so that they could remedy the problem." Id. at ¶(B)(30). Specifically, he states that "the Defendants were aware of the constitutionally-infirm medication system and not having the will to stop using unqualified and ill-trained correctional officers, they simply ignored the plaintiff's repeated requests for help." Id.

The plaintiff asserts that defendant Meisner, as Deputy Warden, "was contacted . . . as a result of the plaintiff's 25th medication-related complaint." Id. at ¶(B)(31). Defendant Thurmer, as Warden, "was informed . . . as a result of the plaintiff's 22nd medication-related complaint." Id. at ¶(B)(32). Defendant Strahota "was formally apprised of the plaintiff's situation at least (8) times via the ICRS [Inmate Complaint Review System]," six times as Security Director and twice as Deputy Warden; the plaintiff cites complaint nos. 3, 4, 15, 21, 22, 25, 22 and 42 . Id. at ¶(B)(33). The plaintiff asserts that defendant Pollard, as Warden, "was formally contacted at least twice in 2012 . . . as a result of complaint numbers 33 and 42." Id. at ¶(B)(34). He asserts that defendant Cooper, as Deputy Warden, "was contacted . . . at least (3) times between 2014 and 2016 as a result of complaint numbers 61, 62 and 76." Id. at ¶(B)(35). Defendant Foster, as Warden, "was formally apprised of the medication

8

problem at least (8) times from 2015 to 2017 as a result of complaint numbers 61, 66, 69, 75, 76, 81, 84 and 85." Id. at ¶(B)(36). Defendant Westra "was contacted at least (4) times between 2016 and 2017 as a result of complaint numbers 76, 84, 86 and 87," id. at ¶(B)(37), and defendant Bauer, as Security Captain, "was contacted . . . in 2011, 2012 and 2017 as a result of complaint numbers 32, 35 and 89," id. at ¶(B)(38). As defendant Meli rose through the ranks at WCI (from Security Captain to Security Director), the plaintiff's complaints "followed" him; the plaintiff says Meli "was contacted" thirteen times through complaint numbers 32, 33, 42, 52, 57, 58, 61, 62, 74, 77, 78, 80, and 85). Id. at ¶(B)(39). Finally, defendant Alsum, who was the "BHS Regional Nursing Coordinator," "was formally contacted at least (18) times between 2010 and 2017 as a result of complaint numbers 28, 33, 35, 43, 45, 46, 48-52, 54, 56, 64-66, 78 and 82." Id. at ¶(B)(40). The plaintiff alleges that "[e]ach time the Defendants were sent a copy of an affirmed complaint they failed to take any steps to transfer the medication-related duties to medical staff even though they were aware that this was the only known solution." Id. at ¶(B)(41).

The plaintiff also alleges that in 2015, defendant Meli "sought to have the plaintiff transferred to WSPF [presumably the Wisconsin Secure Program Facility in Boscobel, WI] so that he would no longer be ringing the alarm concerning the deficient medication process at WCI." Id. at ¶(B)(42). The plaintiff asserts that the Department of Justice blocked the transfer. Id. The plaintiff alleges that "[t]owards 2016-2017," Inmate Complaint Examiner

9

Muenchow (not a named defendant) "began assigning fault to the plaintiff for either filing his complaint after the outages occurred or for not putting refills in himself when he noticed his med card getting low." Id. at ¶(B)(43). The plaintiff asserts that in 2017, "the Defendants finally attempted to solve the problem by taking the onus off of the correctional officer and involving the cell hall sergeants" and had inmates line up outside the sergeants' cage to get medication. Id. at ¶(B)(44). The plaintiff states that while "theoretically the new procedure should have resolved most of the issues, he still missed 441 doses of medication in 2017 and filed eight complaints. Id. at ¶(B)(45).

The plaintiff was transferred to Green Bay Correctional Institution in November 2017, and says that "in the almost three year he has been there, when nursing staff were responsible for dispensing the medication he has only missed one dose." Id. at ¶(B)(47). It is the plaintiff's belief that shortly after he left WCI, the institution went back to having officers dispense medication. Id. at ¶(B)(48).

The plaintiff seeks declaratory relief and nominal, compensatory and punitive damages. Id. at §D.

**III. Analysis**

As the court indicated in its order screening the original complaint, to state a claim under the Eighth Amendment, "a plaintiff must allege that prison officials were deliberately indifferent to a substantial risk of serious harm to inmate health or safety." Dkt. No. 9 at 6, citing Farmer v. Brennan, 511 U.S. 825, 834 (1994). Prison officials act with deliberate indifference when they

10

know of a substantial risk of serious harm and either act or fail to act in disregard of that risk. Roe v. Elyea, 631, F.3d 843, 857 (7th Cir. 2011). As the court found in that first screening order, the plaintiff's mental health needs, migraines, and severe nausea allegedly caused by medication withdrawal constitute a serious medical need. Dkt. No. 9 at 6-7.

The question is whether the plaintiff has alleged sufficient facts to sustain a claim that the defendants, all of whom are supervisors at WCI and/or with the Wisconsin Department of Corrections, were deliberately indifferent to the plaintiff's medical needs. Because all the defendants are supervisors, "deliberate indifference may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or 'turn[s] a blind eye' to it." Perez, 792 F.3d at 781 (quoting Vance v. Peters, 97 F.3d 987, 992-93 (7th Cir. 1996)). The plaintiff alleges that all the defendants knew that he was missing doses because of inmate grievances he filed over a twelve-year span. Dkt No. 12 at ¶¶(B)(31-40). "An inmate's correspondence to a prison administrator may thus establish a basis for personal liability under §1983 where that correspondence provides sufficient knowledge of a constitutional deprivation." Perez, 792 F.3d at 782.

In screening the original complaint, the court found that the plaintiff's complaint implied that various correctional officers over the years "erred in dispensing medication, maintaining the logs, and/or ordering refills;" implied that had HSU staff instead of correctional officers been dispensing medication, the errors would not have occurred; and implied that "in his nearly 100-

11

medication related complaints, the plaintiff notified each defendant that the correctional officers caused each abrupt unavailability and that changing the policy so that correctional officers did not perform these duties would fix the problem." Dkt. No. 9 at 7-8. The court found these implications too tenuous to state a claim and allowed the plaintiff to amend the complaint. Id. The court told the plaintiff that the amended complaint should provide the answers to the following questions:

> [W]hich officers have been responsible for dispensing his medications? How frequently? How often do particular officers neglect to give him medications? What are the medications he does not receive? What does he do when he doesn't receive required medication—does he tell the dispensing officer? What makes him believe the officers are not well-trained? How does he know the officers maintain the medication logs? How has he notified the defendants of this issue—has he used the prison complaint system? How many complaints has he filed and when?

Id.

The amended complaint answers some of these questions. It details WCI's basic process for dispensing medication and explains how correctional officers in general failed to follow that process. Dkt. No. 12 at ¶¶(B)(6-9). The plaintiff says that the amended complaint does not identify which officers failed to follow the process because he felt it "did not matter which officer was dispensing meds as every few weeks the officer dispensing meds on each shift would vary depending on where the plaintiff was housed and rotation of the officer's schedules." Id. at ¶(B)(3).

The amended complaint also provides insight into why the plaintiff believes that HSU staff, rather than correctional officers, should be distributing

12

medication, pointing to the Taycheedah class action and his own experience at Green Bay Correctional Institution. Id. at ¶¶(B)(26-28), (47). He alleges that he has missed only one dose at Green Bay. Id. at ¶47.

But the amended complaint does not reveal the contents of each "medication-related" inmate complaint. The plaintiff does not explain whether he was complaining about specific missed doses or a series of missed doses; whether the complaints described his withdrawal symptoms and the pain he was in; whether he explained that his missed doses and subsequent symptoms were the result of corrections officers, rather than HSU personnel, being responsible for distributing medication. Under Perez, liability hinges on whether the prison administrators were notified of a constitutional deprivation, so these details are important. The Perez court found that the prison administrators could be held liable because they "each obtained actual knowledge of Perez's objectively serious medical condition and inadequate medical care through Perez's coherent and highly detailed grievances and other correspondences." Perez, 792 F.3d at 782.

The court can't tell from the amended complaint whether the defendants—all prison administrators—knew about a constitutional deprivation. The most pertinent information the plaintiff provides is that he believes he missed over 4,200 doses and complained about it nearly 100 times, but he did not complain about it to each defendant nearly 100 times. At most, each defendant had some role in reviewing one or more complaints from the plaintiff over several years. Without knowing what those complaints said, and

13

whether each one was cumulative (identifying how many times total the plaintiff had missed medication doses and what symptoms he'd suffered as a result), there is no way to determine whether any defendant had reason to know that the plaintiff was missing medication as frequently and routinely as he alleges.

And while "a plaintiff does not need to show that the official intended harm or believed that harm would occur . . . showing mere negligence is not enough. . . . Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim." Petties v. Carter, 836 F.3d 772, 728 (7th Cir. 2016). The plaintiff does not suggest that the defendants' failure to address their inferiors' consistent failures to follow procedure rises to a level beyond objective recklessness. The plaintiff's allegations also suggest that staff at WCI—specifically the inmate complaint examiners—would take measures to address his concerns over the years, including increasing training, talking with officers who may have failed to follow procedure and ultimately changing the procedure. While the plaintiff may not have gotten the relief he wanted as quickly as he wanted, his allegations suggest that he did get some relief.

In support of his claim that the defendants ignored his complaints, the plaintiff alleges that the defendants would not take corrective action because they did not take the issue seriously and didn't want to implement a costly alternative. Dkt. No. 12 at ¶(B)(12). This appears to be speculation; the plaintiff does not assert specific facts to support these allegations (such as a supervisor

14

telling him that having HSU nurses dispense medication would cost too much, or a supervisor telling him to stop making such a big deal about missing a dose now and then). While district courts are entitled to construe complaints filed by unrepresented parties liberally, the complaint's allegations "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citation omitted). The plaintiff's allegations speculate on the state of mind of the defendants; they are not supported with facts that would allow the court to "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.

Because the plaintiff failed to allege that the defendants knew about a constitutional deprivation and ignored it, he has not stated a claim upon which relief can be granted. The court must dismiss the case.

**IV. Conclusion**

The court **ORDERS** that this case is **DISMISSED** under 28 U.S.C. §§1915(e)(2)(B) and 1915A(b)(1) because the amended complaint fails to state a claim. The clerk will enter judgment accordingly.

The Clerk of Court will document that the plaintiff has incurred a "strike" under 28 U.S.C. §1915(g).

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within thirty days of the entry of judgment. See Fed. R. of App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect

15

for not being able to meet the thirty-day deadline. <u>See</u> Fed. R. App. P. 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within twenty-eight days of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 14th day of December, 2020.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER
Chief United States District Judge**

16

Case 2:18-cv-01830-PP   Filed 12/14/20   Page 16 of 16   Document 13