UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSHUA HOWARD,

                    Plaintiff,

        v.                                   Case No. 18-cv-1830-pp

LINDA ALSUM-O'DONOVAN, WILLIAM BAUER,
SARAH COOPER, BRIAN FOSTER,
WARDEN MICHAEL MEISNER,
ANTHONY MELI, WILLIAM J. POLLARD,
DONALD STRAHOTA, MICHAEL THURMER,
and JEREMY WESTRA,

                    Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION TO AMEND COMPLAINT
(DKT. NO. 43), SCREENING THIRD AMENDED COMPLAINT AND DENYING
WITHOUT PREJUDICE PLAINTIFF'S MOTION TO COMPEL (DKT. NO. 50)**

---

On May 18, 2021, the court granted the plaintiff's motion to reconsider, reopened the case and allowed the plaintiff to proceed on his second amended complaint, in which he alleges that the defendants—various security officials and the regional nursing coordinator at Waupun Correctional Institution—were deliberately indifferent to his serious medical needs based on their continued use of correctional officers to distribute medication, maintain medication records and issue refill slips to the Health Services Unit, in violation of the Eighth Amendment to the United States Constitution. Dkt. No. 21 (order granting motion to reconsider and screening second amended complaint); Dkt. No. 22 at 3, ¶3 (second amended complaint). On March 30, 2022, the court denied the defendants' motion to dismiss the second amended complaint. Dkt.

1

No. 36. The defendants filed their answer on April 13, 2022. Dkt. No. 40. The next day, the court entered a scheduling order setting deadlines for the completion of discovery and filing dispositive motions. Dkt. No. 41.

On July 13, 2022, the plaintiff filed a motion to amend the complaint along with a proposed amended complaint.[1] Dkt. Nos. 43, 43-1. In support of his motion to amend, the plaintiff states that primarily he seeks to amend the complaint to add three defendants who worked at the Bureau of Health Services (BHS) during the relevant time: Director James Greer and Medical Directors David Burnett and Ryan Holzmacher. Dkt. No. 43 at 1. The plaintiff states that these individuals were the superiors of Waupun's Health Services Unit (HSU) Manager Belinda Schrubbe who, while testifying under oath in October of 2021, stated for the first time that she repeatedly made pleas to BHS about the need to change Waupun's practice of using correctional officers to distribute medication—ostensibly due (at least in part) to the plaintiff's many years of medication issues—but her requests were denied. Id. The plaintiff also states that due to the unique origins of this case, the operative complaint is supported by a declaration and an exhibit, and this amendment would allow all the information to be incorporated into a single document. Id. at 2. In response to the plaintiff's motion to amend, the defendants ask the court to screen the proposed third amended complaint and give them sixty days to respond if the court screens through any additional defendants. Dkt. No. 47.

---

[1] The plaintiff titles this pleading "Second Amended 42 U.S.C. § 1983 Complaint," but it would be his *third* amended complaint.

After the plaintiff filed his motion to amend, he filed a motion to compel responses to requests for interrogatories and admissions. Dkt. No. 50. In response, the defendants filed a motion to stay the dispositive motions deadline pending screening and the issuance of a new scheduling order, dkt. no. 51, which the court granted, dkt. no. 52.

The plaintiff's motion to compel and the defendants' motion to stay state that the parties disagree on the claim upon which the court previously allowed the plaintiff to proceed. Dkt. No. 50 at 1-3; Dkt. No. 51 at ¶¶5-8. According to the plaintiff, the defendants' objections to his discovery requests lack merit because the court allowed him to proceed "against each Defendant in their individual capacity, on a claim that they were deliberately indifferent to his serious medical needs[.]" Dkt. No. 50 at 1. The plaintiff also states:

> Now, the Defendants refuse to respond to any of the requests on the basis that the Plaintiff does 'not have individual deliberate indifference claims against individual defendants.' (P-Ex. B. at 1) Despite the Court having denied their motion to dismiss, (Dkt. 30), based in part on the fact that the plaintiff 'has sued the defendants in their individual capacities,' (Dkt. 36), the defendants continue to assert that the court's use of the word 'claim' in a singular context is evidence supporting their position that the plaintiff was allowed to proceed on a single claim of a deficient policy and what each defendant may or may not have done is not relevant to this claim. (P-Ex. E)
>
> The contention made by defendants is absurd. The Court allowed the plaintiff to proceed against each defendant in their individual capacity based on their personal involvement in the plaintiff's multi-year episode of attempting to timely receive his medications. Accordingly, the requests which specifically refer to interactions they had with the ICRS and statements they made, are reasonable and relevant and defendants should be ordered to respond in full to the plaintiff's requests for interrogatories and admissions.

3

Dkt. No. 50 at 2-3.

The defendants, on the other hand, maintain that the plaintiff is proceeding on one deliberate indifference claim against all defendants:

> 5. The parties currently disagree on what claims the Plaintiff was allowed to proceed on by the Court. The Plaintiff argues that he has been allowed to proceed on individual deliberate indifference claims against multiple defendants about each individual instance in which he alleges he did not receive a medication on a particular date, dating back as far as 2004. (*See* Dkt. 50.)

> 6. The Court issued a clarifying order on July 13, 2021, stating:

>> The court has allowed the plaintiff to proceed on the claim alleged in the amended complaint docketed May 18, 2021—that, in the plaintiff's own words, the defendants "were deliberately indifferent to the plaintiff's serious medical needs based on their continued use of correctional officers to distribute medication, maintain medication records and issue refill slips to [the Health Services Unit], after it was well known to be a deficient practice within the DOC in general and specifically at [Waupun]." Dkt. No. 22 at ¶B(3). That is the only claim on which the court has allowed the plaintiff to proceed. (Dkt. 27:2.)

> 7. Counsel for the Defendants reads this order to state that Plaintiff was allowed to proceed on a single claim based on the DOC policy allowing officers to distribute medication, maintain medication records, and issue refill slips to the HSU, and whether the Defendants were deliberately indifferent to Plaintiff's serious medical needs through this DOC policy.

Dkt. No. 51 at 2.

This order addresses the plaintiff's motion to amend the complaint, screens the proposed third amended complaint, orders service of the third amended complaint on new defendants and sets a deadline for the defendants

4

to file a responsive pleading to the third amended complaint. The order also denies without prejudice the plaintiff's motion to compel.

## I.    Federal Screening Standard

Under the PLRA, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated plaintiff raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

5

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

## II.    Allegations in the Proposed Third Amended Complaint

The proposed third amended complaint names the ten defendants from the plaintiff's second amendment complaint and three new individuals whom he referenced in his motion to amend. Dkt. No. 43-1 at 1-2. The plaintiff describes his Statement of Claim as follows:

> This action alleges that the Director, Medical Directors and Regional Nursing Coordinator of the Bureau of Health Services (BHS) and various security officials at the Waupun Correctional Institution (WCI) were deliberately indifferent to the Plaintiff's serious medical needs based on their continued use of correctional officers to distribute medication, maintain medication records and issue refill slips to the Health Services Unit (HSU) after it was well known to be a deficient practice in the Department of Corrections (DOC) in general, and specifically, at WCI.

> The plaintiff has been prescribed medication by a psychiatrist to treat his depression, anxiety and insomnia since 2004 and, as of 2017, he has missed over (4000) doses of medication either because the officer incorrectly determined his medication was out or due to an officer not timely ordering a refill.

> The hundreds of separate instances of abrupt unavailability of his medication has caused the Plaintiff to experience insomnia,

6

migraine headaches, severe nausea, suicidal ideations and a complete disruption of his emotional well-being and mental health, in addition to an exacerbation of his underlying symptoms of depression, insomnia and anxiety.

Id. at §B, ¶¶1-3.

### A. Officer Training

The plaintiff alleges that DAI Policy 500.80.11 allows for correctional staff to dispense controlled medication to incarcerated persons and requires that they receive pre-service training in medication delivery and annual refresher courses. Id. at ¶4. The plaintiff alleges that the training is inadequate and does not provide a sufficient foundation to allow officers to perform these tasks. Id. at ¶6. The plaintiff alleges that since 2014, officers may take "annual follow-up training" but the fact that officers failed to take the annual training or "speed-clicked" through it is documented in their training records, which are readily available to defendants, yet no corrective action was taken to ensure that the officers take this part of their duty seriously. Id. at ¶¶9, 10.

### B. Medication Procedure at Waupun

The plaintiff alleges that at Waupun, correctional staff distribute controlled medication, maintain the medication logs and order refills. Id. at ¶11. Correctional staff allegedly dispense medication from a ten-by-five-inch "card" containing thirty to sixty individual pills; depending on dosage, each "card" can last for ten to thirty days. Id. The plaintiff alleges that for every incarcerated person who takes medication, the HSU prepares a monthly log (DOC-3026), so that for each applicable medication and time there is a box corresponding to the date for the officer to enter a code. Id. at ¶15. The plaintiff

7

alleges that at "med delivery time," the range officers report to the sergeant's cage and are given baskets containing the medication cards for their range and a binder containing the relevant incarcerated person's "med logs." Id. at ¶17. The range officers allegedly carry the baskets and the binder to a cart located on each range and proceed to dispense the medication. Id. The plaintiff states that when an incarcerated person's med log shows he is to receive a medication and it is not on the officer's cart, the officer is supposed to confirm with the sergeant that the medication isn't on the unit; if it isn't, "their training instructs them to contact HSU so the medication can be brought to the unit." Id. at ¶18.

C.    Delivery of Plaintiff's Medication at Waupun

The plaintiff alleges that there was no pattern to the unavailability of his medication and that at any given medication pass any of his three medications were liable to be out. Id. at ¶19. He states that between 2004 and 2017, all three medications simultaneously were out a total of 324 times. Id. The plaintiff alleges that from 2004 to 2017, he missed 4,284 doses of medication and that, during that time, dozens of different officers were responsible for dispensing his medication. Id. at ¶20. He states that of the missed doses, 15% were the result of a timely refill not being filed and for the other 85%, a medication card was in the cell hall but the correctional staff did not locate it. Id.

The plaintiff alleges that he would often file a complaint that his medication was unavailable, and the inmate complaint examiner (ICE) would contact the HSU Manager who would pull the relevant month's DOC-3026 and

see what the plaintiff's med chart showed. Id. at ¶22. This allegedly would lead to a determination that third shift staff had not timely submitted a refill slip or HSU would respond that based on when the last card of medication was sent, the plaintiff should not be "out." Id. The plaintiff alleges that the HSU Manager would tell the ICE that this was contrary to the training that the officers were supposed to have received and that when a medication is not there, they should inform the sergeant so that he can call HSU and resolve the problem immediately. Id. at ¶23. According to the plaintiff, the complaint "would be affirmed and forwarded to Defendants for follow-up and, upon information and belief, the Defendants failed to take any corrective action either because they did not take the delivery of medication to be a serious responsibility of correctional staff or they did not believe that any amount of follow-up would solve the inherent problems that came with using officers in this capacity. Id. at ¶24.

D.    Using Correctional Staff was a Known Problem

The plaintiff alleges that the DOC has known for several years that having correctional officers maintain medication logs and distribute medication is dangerous. Id. at ¶25. In 2001, the Wisconsin Legislative Audit Bureau (LAB) allegedly issued an extensive audit of DOC healthcare and cited the delivery of controlled medications by correctional officers as an area of concern. Id. The plaintiff alleges that the defendants were aware of this finding. Id. at ¶26.

The plaintiff alleges that in a 2004 report, LAB repeated that the practice of relying on untrained corrections officers to distributed controlled

9

medications was problematic because (1) correction staff have minimal medical training and are less able to identify dangerous side effects; (2) records of medication delivery are invariably less complete and accurate when maintained by corrections staff; and (3) under the terms of their employment agreement, corrections staff may not be disciplined for unintentional errors when delivering medications. Id. at ¶27. In addition, the plaintiff alleges that in a 2006 self-assessment, the DOC proclaimed that it was "committed to developing a long-term, viable alternative to the practice of correctional officers distributing medications and acknowledged that risk management was an ongoing concern due to officers' lack of clinical training." Id. at ¶29. The defendants allegedly knew about the findings of the 2004 LAB report and the DOC's 2006 self-assessment. Id. at ¶30.

The plaintiff alleges that the defendants were aware of a 2006 class action in which the court granted an injunction in 2009 requiring all controlled medication at Taycheedah Correctional Institution, a DOC institution, to be distributed by trained medical personnel to remedy the serious risks associated with officer administered medications, see Flynn v. Doyle, 630 F. Supp. 2d 987 (E.D. Wis. 2009). Dkt. No. 1 at ¶¶31-32.

E.    Personal Involvement of Defendants

1.    *Lori Alsum*

The plaintiff alleges that Alsum, the BHS Regional Nursing Coordinator, was formally contacted relating to several of the plaintiff's missed medication complaints between 2012 and 2017. Id. at ¶35. In 2012, she allegedly received

copies of two affirmed inmate complaints, and she was the reviewing authority on a third inmate complaint. Id.

The plaintiff alleges that in 2013, Alsum was involved in six complaints, for five of which she acted as the reviewing authority. Id. at ¶37. He states that when Alsum affirmed an inmate complaint about a June outage of the plaintiff's depression medication, the HSU Manager told Alsum that measures had been implemented to monitor the plaintiff's refills. Id. Acting as the reviewing authority for the plaintiff's complaints of medication outages in September and October, Alsum allegedly sent a copy of one complaint to supervisory staff after determining that officers had marked the medication as being out even though "they"—presumably the medications—were on the unit. Id.

In 2014, Alsum was the reviewing authority for four of the plaintiff's complaints. Id. at ¶39. In response to a February outage of the plaintiff's depression medication, Alsum allegedly affirmed the ICE's recommendation that a review occur along with the development of a plan to eliminate the medication delivery issues. Id. In response to a June outage, Alsum allegedly sent a copy of an affirmed complaint to defendant Anthony Meli so that he could follow up as to why the officer had marked in the med log that the plaintiff's medication was out without contacting HSU and inquiring about a refill. Id.

The plaintiff alleges that Alsum was involved in three complaints in 2015. Id. at ¶41. She allegedly received a copy of a complaint about an April outage

and when a complaint about a third April outage of the same medication was affirmed, Alsum was sent a copy along with supervisory staff so that they could follow up with officers regarding the need for accurate documentation of the med logs. Id. The plaintiff states that Alsum was informed that the problem had not been fixed when she received a copy of a complaint regarding a November outage of the plaintiff's medication. Id.

In 2017, Alsum allegedly affirmed two complaints as the reviewing authority. Id. at ¶43. In March, she allegedly instructed the HSU Manager and the Security Director to review the ongoing problem. Id. The plaintiff states that when Alsum affirmed another complaint later that year, it should have been apparent that the reviews and prior attempts had failed. Id.

The plaintiff claims that Alsum's failure to act constitutes deliberate indifference to the plaintiff's serious medical needs in violation of the Eighth Amendment. Id. at ¶45.

### 2. *Wayne Bauer*

The plaintiff alleges that Bauer, Waupun's Security Captain, was contacted at least five times between 2011 and 2017 concerning the non-delivery of the plaintiff's medication. Id. at ¶46. In 2011, the plaintiff and the ICE allegedly contacted Bauer because a correctional officer refused to give the plaintiff his medication, and Bauer was tasked with investigating to identify the officer. Id. The plaintiff states that in 2012, he and the ICE contacted Bauer to review a complaint that the officer had marked medication as being unavailable despite it being on the unit. Id. In 2013, Bauer allegedly was sent a copy of

12

another complaint. Id. The plaintiff states that Bauer was contacted again in 2017 when he was sent a copy of another medication complaint. Id.

The plaintiff alleges that Bauer failed to take any action in response to the above-described contacts. Id. at ¶47. He claims that Bauer's failure to act constitutes deliberate indifference to the plaintiff's serious medical needs in violation of the Eighth Amendment. Id. at ¶48.

### 3. David Burnett

The plaintiff alleges that Burnett, the Medical Director of BHS until 2010, knew about the plaintiff not receiving his medication from his contacts with Alsum and Schrubbe. Id. at ¶49. The plaintiff indicates that Burnett was one of the defendants in the Flynn case (the case involving medication distribution at Taycheedah) and "had personal involvement in complying with the injunction to stop having officers dispense medication at [Taycheedah] and the final settlement which implemented new policies making the change permanent." Id. at ¶50. The plaintiff states that Schrubbe contacted Burnett and "formally requested" that "they" stop using correctional officers to distribute medication due in part to the plaintiff's issues, but Schrubbe's requests were denied. Id. at ¶51. The plaintiff alleges that despite being aware of the dangers of using correctional staff to distribute medication, maintain med logs and the ongoing problem at Waupun and with the plaintiff, Burnett failed to take any action. Id. at ¶52. The plaintiff claims that Burnett's failure to act constitutes deliberate indifference. Id. at ¶53.

13

4. *Sarah Cooper*

The plaintiff alleges that Cooper, Deputy Warden at Waupun, was contacted at least three times between 2015 and 2016. Id. at ¶54. In May 2016, Cooper allegedly was sent a copy of a complaint that directed the Security Director to conduct further review and staff training regarding the plaintiff's medication issues. Id. at ¶55. The next month, Cooper was sent a copy of another complaint which reported that Waupun had implemented a system of checks and balances to ensure that staff were processing and documenting med passes. Id. at ¶56. The plaintiff states that on January 6, 2017, Cooper was sent a copy of another complaint, which would have informed her that the reviews, training and systems implemented the previous year had failed to solve the problem; the plaintiff says that Cooper also "would have seen" that the inmate complaint examiner had sent a copy of that complaint to defendant Jeremy Westra "for the purpose of instructing staff regarding the need to properly fill out the med logs." Id. at ¶57.

The plaintiff alleges that Cooper failed to take any action in response to being notified of the problem, including not following up with her subordinates to ensure that staff had conducted training in May and July of 2016, "that an actual system of checks and balances have been implemented in 2016," failing to act when informed in 2017 that those efforts were unsuccessful and failing to ensure that defendant Westra conducted further training. Id. at ¶58. The plaintiff claims that Cooper's failure to act constitutes deliberate indifference to the plaintiff's serious medical needs. Id. at ¶59.

14

5. *Brian Foster*

The plaintiff alleges that Foster, Warden at Waupun, was formally apprised of the medication problem at least nine times between 2015 and 2017 and that Foster discussed the issue with the corrections complaint examiner. Id. at ¶60. The plaintiff alleges that Foster was sent a copy of a complaint in which the ICE stated that, as of September 2015, Meli had initiated a weekly audit of the medication sheets to ensure accuracy and compliance. Id. at ¶61. Foster allegedly failed to properly supervise Meli to make sure he completed weekly audits and conducted appropriate review and training. Id. at ¶62.

The plaintiff alleges that in July 2016, Foster talked to the corrections complaint examiner regarding a different complaint and informed her that Waupun had instituted a process of checks and balances to ensure that officers were processing and documenting med passes. Id. at ¶63. According to the plaintiff, the new process described by Foster either did not exist or Foster failed to make sure his subordinates carried out the plan. Id.

In September 2016, Foster allegedly was sent a copy of a complaint which showed that the weekly audits and system of checks and balances either were not happening or were not helping. Id. at ¶64. In November 2016, in response to another complaint, the ICE allegedly recommended that an evaluation of the medication process be conducted to determine the problem. Id. at ¶65. The plaintiff states that Foster either failed to take this action or failed to make sure that it was carried out. Id.

15

The plaintiff alleges that in response to another complaint, Foster affirmed the ICE's recommendation that Captain Haynes conduct further review of the second shift's medication sheet documentation. Id. at ¶66. Foster allegedly failed to ensure that Haynes followed up with staff and failed to take remedial action when it became apparent that he had failed to do anything. Id. at ¶67.

The plaintiff alleges that Foster was the reviewing authority for another complaint where the ICE pointed out that there were multiple errors in the med log and recommended that Westra take appropriate action with staff regarding the need to properly fill out the med logs. Id. at ¶68. On November 7, 2017, the Office of the Secretary allegedly found that Foster should review the matter and take appropriate remedial action with staff about failure to properly fill out the med logs. Id. at ¶69. The plaintiff alleges that Foster failed to take remedial action or implement further training. Id. at ¶70. The plaintiff claims that Foster's failure to act constitutes deliberate indifference to the plaintiff's serious medical needs. Id. at ¶71.

6. *James Greer*

The plaintiff alleges that Greer, the Director of the BHS, also was a defendant in the Flynn case and had personal involvement in complying with the injunction to stop having officers dispense medication at Taycheedah. Id. at ¶72. The plaintiff alleges that the Office of the Secretary sent a copy of an affirmed complaint to Greer which detailed the ongoing problems the plaintiff

16

was having and recommended that the warden conduct further training and reinforcement on the issue of staff properly completing the med logs. Id. at ¶73.

The plaintiff alleges that Greer knew from Alsum and Schrubbe that the plaintiff was not receiving his medication. Id. at ¶74. Schrubbe allegedly contacted Greer and requested that "they" stop the practice of using correctional officers to distribute medication, in part due to the plaintiff's issues. Id. The plaintiff alleges that despite being aware of the dangers of using correctional staff to distribute medication and maintain med logs and the ongoing problem at Waupun and with the plaintiff, Greer failed to take any action. Id. at ¶75. The plaintiff claims that Greer's failure to act constitutes deliberate indifference to the plaintiff's serious medical needs. Id. at ¶76.

### 7. *Ryan Holzmacher*

The plaintiff alleges that Holzmacher took over for Burnett as Medical Director of BHS in 2010. Id. at ¶77. Holzmacher allegedly knew from Alsum and Schrubbe about the plaintiff not receiving his medication. Id. The plaintiff alleges that Schrubbe contacted Holzmacher and requested that "they" stop using correctional officers to distribute medication, in part due to the plaintiff's issues, and that Schrubbe's requests were denied. Id. at ¶78. The plaintiff alleges that despite being aware of the dangers of using correctional staff to distribute medication and maintain med logs and the ongoing problem at Waupun and with the plaintiff, Holzmacher failed to take any action. Id. at ¶79. He claims that Holzmacher's failure to act constitutes deliberate indifference to the plaintiff's serious medical needs. Id. at ¶80.

17

### 8. *Michael Meisner*

The plaintiff alleges that Meisner, Deputy Warden at Waupun, was contacted in 2009 because of the plaintiff's twenty-fifth medication-related complaint. Id. at ¶81. The HSU Manager allegedly informed the ICE that the issue had been raised to Meisner and Meli and that it was being addressed with the cell hall sergeants, and further recommended that a more specific tracking system be developed for all aspects of the plaintiff's medication needs. Id. The plaintiff alleges that Meisner failed to properly supervise Meli and his other subordinates to make sure further training was conducted and that the tracking system was developed and, upon learning that nothing had been done, failed to take remedial action. Id. at ¶82. The plaintiff claims that Meisner's failure to act constitutes deliberate indifference to the plaintiff's serious medical needs. Id. at ¶83.

### 9. *Anthony Meli*

The plaintiff alleges that Meli, Waupun Security Captain in 2011 and Security Director from 2012 to 2017, was contacted thirteen times between 2011 and 2017. Id. at ¶84. In November 2011, the plaintiff allegedly filed an inmate complaint that the second shift range officer intentionally refused to give him his medication. Id. at ¶85. Meli and Bauer allegedly were tasked with identifying the officer and determining the cause of the missed dosage. Id. The plaintiff states that Meli did not investigate the incident and he did not ensure that Bauer interviewed the officer. Id.

The plaintiff alleges that in February 2012, the ICE recommended that Meli investigate the fact that an entire card of the plaintiff's medication was missing and review the medication delivery and documentation process because the med logs were not properly filled out. Id. at ¶86. Meli allegedly did not do this. Id. In December 2012, Meli allegedly received a copy of an affirmed complaint when the plaintiff's medication had not been refilled for two weeks, but Meli failed to take any action. Id. at ¶87.

In 2014, the ICE allegedly sent Meli a copy of an affirmed complaint that stated that the officer had failed to follow procedure (by simply noting that the medication was out but not contacting HSU about a refill) and recommended that Meli follow up on the matter. Id. at ¶88. The plaintiff alleges that Meli failed to implement further training or take remedial action. Id.

The plaintiff alleges that in "early" 2015, Meli referred the plaintiff to a transfer from Waupun to the Wisconsin Secure Program Facility in Boscobel, Wisconsin. Id. at ¶89. The plaintiff believes that the transfer was "put in motion" to get the plaintiff out of Waupun and stop him filing (affirmed) complaints directing the security staff to solve the medication distribution problems. Id. He alleges that although the transfer was approved, counsel at the Department of Justice found out about the transfer, "which appeared to be retaliatory," the DOJ asked why the plaintiff was being transferred and "ultimately ordered the Warden to immediately rescind the transfer." Id. at ¶90.

The plaintiff alleges that in September 2015, in response to a complaint that the plaintiff's med log was incomplete, Schrubbe told the ICE that Meli

19

had told her he was conducting a weekly audit of the med logs for each cell hall to ensure accuracy and compliance. Id. at ¶91. The plaintiff states that Meli failed to conduct weekly audits or instruct a subordinate to do so. Id.

The plaintiff alleges that in November and December 2015, Meli received two similar affirmed complaints where that ICE focused on the fact that the plaintiff's med logs contained errors and recommended that Meli follow up on staff training for the proper documentation of med logs. Id. at ¶92. Meli allegedly failed to implement further training or take remedial action. Id.

In May 2016, the Office of the Secretary allegedly recommended that Meli follow up on an affirmed complaint by conducting further review and training with respect to officers properly documenting the med logs. Id. at ¶93. Meli allegedly failed to implement further training or take remedial action. Id. In November 2016, the ICE recommended that Meli and the HSU evaluate the medication issue with the goal of eliminating the recurring problem. Id. at ¶94.

The plaintiff alleges that in 2017, Meli tried to resolve the problem by having officers dispense medication from the sergeant's cage, "so instead of placing the med cards on carts and delivering the medication to the inmates' cells, the inmates would line up at the sergeant's cage and receive the medication from their range officer in the presence of the sergeant." Id. at ¶96. According to the plaintiff, "[o]n paper this seems to be a likely resolution," but he alleges that the new procedure did not solve the problem "as the Plaintiff filed several medication complaints throughout 2017." Id. at ¶¶96, 97. The plaintiff alleges that this led Meli to implement an emergency transfer of the

plaintiff to Green Bay Correctional Institution, which occurred on October 27, 2017. Id. at ¶97. The plaintiff claims that Meli's failure to act constitutes deliberate indifference to the plaintiff's serious medical needs. Id. at ¶99.

10. *William Pollard*

The plaintiff alleges that Pollard was the reviewing authority for three medication complaints in 2011 and was formally contacted at least twice in his capacity as warden in 2012. Id. at ¶100. In May 2011, Pollard allegedly was the reviewing authority for a complaint where staff failed to give the plaintiff his medication. Id. at ¶101. In November 2011, Pollard allegedly was the reviewing authority for two complaints involving a situation where it appeared that an officer intentionally withheld the plaintiff's medication. Id. The plaintiff alleges that Pollard affirmed the ICE's recommendation that two of his captains conduct further investigation into the incident. Id.  Pollard allegedly failed to supervise his captains and make sure they conducted the further investigation. Id. at ¶102.

The plaintiff alleges that in February 2012, the ICE forwarded a copy of an affirmed complaint to Pollard, which described the plaintiff's history of medication problems (which included twenty-four complaints dating back to 2005), and recommended that there be further investigation as well as a review of the medication delivery and documentation process. Id. at ¶103. Pollard allegedly failed to have his subordinates address these issues. Id. at ¶104.

The plaintiff alleges that ten months later, another complaint was forwarded to Pollard which stated that officers failed to properly fill out the med

log or contact HSU when the plaintiff's medication was not available for a two-week period. Id. at ¶105. The plaintiff alleges that Pollard took no action the previous year and did not have the officer who was working reprimanded or undergo further training. Id. The plaintiff claims that Pollard's failure to act constitutes deliberate indifference to the plaintiff's serious medical needs. Id. at ¶106.

### 11. *Donald Strahota*

The plaintiff alleges that between 2006 and 2009, Strahota was "apprised of the plaintiff's situation" six times in his capacity as Security Director at Waupun and two times in 2012 in his capacity as Deputy Warden. Id. at ¶107.

The plaintiff alleges that in September 2006, the ICE forwarded a copy of an affirmed complaint to Strahota after finding a discrepancy in the plaintiff's med logs. Id. at ¶108. Strahota allegedly failed to conduct any review, order any training or take remedial action against the officer in question. Id. About six months later, a copy of a complaint was allegedly forwarded to Strahota so that he could review the procedures relating to medications and he allegedly failed to take any action. Id. at ¶109.

The plaintiff alleges that the following year, Strahota was sent a copy of an affirmed complaint for reference regarding staff actions when a medication appeared not to be available. Id. at ¶110. He allegedly failed to take any action against the officer who didn't follow policy. Id. About six months later, Strahota allegedly received a copy of six "summary" complaints in which the ICE described the officer errors, the fact that they had been chronically repeated for

22

a period of months or years and, "in this instance, had filed[2] [seventeen] prior complaints of this nature." Id. at ¶111. The ICE allegedly recommended a drastic review or overhaul of the plaintiff's medication system and forwarded the complaint to those capable of implementing the recommendation. Id. Strahota allegedly was sent a copy of the complaint on December 9, 2008, but failed to take any action. Id.

The plaintiff alleges that in February 2009, the ICE forwarded a complaint to Strahota for follow-up on the medication delivery issue, but Strahota failed to take any action. Id. at ¶112. In July 2009, the ICE allegedly forwarded an affirmed complaint to Strahota which recommended "a more specific tracking system [] be developed for all aspects of Howard's medication needs." Id. at ¶113 (alteration in the original). Strahota allegedly failed to take any action in response to this affirmed complaint. Id.

In February 2012, Strahota received another summary complaint from the ICE which informed him that the problem had not been resolved. Id. at ¶114. The ICE allegedly stated that the issue had been going on for seven years and that there had been twenty-four complaints. Id. The complaint was forwarded to Strahota, a supervisor and a subordinate to investigate missing medication and review the medication delivery and documentation process. Id. The plaintiff asserts that Strahota again failed to act. Id. In December 2012, Strahota allegedly was sent an affirmed complaint, which stated that the

---

[2] Presumably the plaintiff means that he had filed the seventeen prior complaints, though the sentence is a fragment and has no subject.

plaintiff did not receive his medication for two weeks. Id. at ¶115. Strahota allegedly failed to order any further training or reprimand the responsible parties. Id. The plaintiff claims that Strahota's failure to act constitutes deliberate indifference to the plaintiff's serious medical needs. Id. at ¶116.

12.  *Michael Thurmer*

The plaintiff alleges that, between 2008 and 2009, Thurmer acted as the reviewing authority for four of the plaintiff's medication-related complaints and that he was sent a copy of a fifth affirmed complaint. Id. at ¶117. The plaintiff alleges that for the first complaint, Thurmer inexplicably rejected the complaint and, in response to a separate complaint, the ICE issued an amended report finding that the plaintiff had likely been without his medication for five days. Id. at ¶118. Thurmer allegedly affirmed the complaint but did not follow up with the HSU Manager as to what action had been or should have been taken. Id.

In March 2008, Thurmer allegedly acted as the reviewing authority on two complaints, one complaining that a sergeant refused to give the plaintiff his medication and the other faulting the HSU for not excusing the plaintiff from work after he had gone without his medication. Id. at ¶119. Thurmer allegedly did not take any action in response to those complaints. Id.

The plaintiff alleges that in October 2008, Thurmer acted as the reviewing authority for a complaint where the plaintiff said he had not received his medication and the med log was blank for those days. Id. at ¶120. He

24

allegedly failed to order a training refresher or remedial action for the officer who did not follow procedure. Id.

In February 2009, a "summary" complaint was allegedly sent to Thurmer in which the ICE stated that this was the plaintiff's nineteenth medication complaint and recommended a revision of the medication delivery system as it related to the plaintiff. Id. at ¶121. Thurmer allegedly failed to take any action in response to receiving a copy of this complaint. Id. The plaintiff claims that Thurmer's failure to act constitutes deliberate indifference to the plaintiff's serious medical needs. Id. at ¶122.

### 13. *Jeremy Westra*

The plaintiff alleges that Westra, the Supervising Captain of the plaintiff's cell hall, was contacted at least five times by the plaintiff and/or the ICE between 2016 and 2017. Id. at ¶123.

The plaintiff alleges that on December 9, 2016, he wrote to Westra and complained that an officer had failed to give him his medication on November 27, 2016. Id. at ¶124. The ICE allegedly recommended dismissal of the complaint with the modification that a copy be sent to Westra for informational and instructional purpose with staff regarding properly filling out med logs. Id. The plaintiff says that on January 24, 2017, the Office of the Secretary affirmed the complaint and stated that a copy was being sent to Westra "for the purpose of following up with staff regarding the need to properly fill out the med logs." Id. Westra allegedly failed to follow up with staff. Id.

25

In April 2017, the plaintiff allegedly contacted Westra about a medication issue on the instruction of the ICE but, contrary to policy, Westra failed to respond. Id. at ¶125. The plaintiff states that in June 2017, he wrote to Westra about not receiving his medication and Westra failed to reply. Id. at ¶126. The plaintiff states that on August 3, 2017, he wrote to Westra about not receiving his medication and Westra replied that he should address his complaints to the sergeant, even though the ICE had instructed the plaintiff to contact Westra. Id. at ¶127. The plaintiff states that in response to the plaintiff writing to Westra about a separate medication issue in August of 2017, Westra replied that he would follow-up with staff, but he did not do so. Id. at ¶128. The plaintiff claims that Westra's failure to act constitutes deliberate indifference to the plaintiff's serious medical needs. Id. at ¶129.

F.    General Allegations and Claims

The last seven paragraphs of the plaintiff's proposed third amended complaint summarize his allegations and purported claims against the defendants:

> The plaintiff filed nearly 100 medication-related complaints over a twelve-year period and, as a result, the Defendants were all contacted at various times so that they could remedy the problem. Upon information and belief, the Defendants were aware of the constitutionally-infirm medication system and not having the will to stop using unqualified and ill-trained correctional officers, they simply ignored the plaintiffs repeated requests for help.
>
> The Defendants continued the practice fully aware of the problems because the only remedy was to use nursing staff which would cost more, and therefore, was not considered a viable option regardless of the harm using corrections staff caused the plaintiff and other [Waupun] inmates.

26

The BHS and [Waupun] defendants were also deliberately indifferent to the plaintiff's serious medical needs when they continued to assign pre-service and refresher training that was inadequate in content and in function as the computer courses estimated to take a half hour were repeatedly completed in a matter of several seconds. Had the section of training devoted to dispersing medication and maintaining medication logs been more comprehensive and followed up with remedial action when not adhered to in the cell halls, the number of "unavailable" doses that the plaintiff experienced would have been significantly less.

In addition to the first-hand knowledge the BHS defendants received from Defendants Alsum, HSU Manager Schrubbe, and having direct contact through the [Inmate Complaint Review System], they also had an overview of all of the DOC institutions, not to mention their involvement in the *Flynn* class action, which gave them a knowing perspective that maximum security institutions like [Green Bay Correctional Institution] and [Taycheedah Correctional Institution], which used nursing staff to dispense controlled medication, had virtually no instances of missed medication due to staff error, improperly filled out medication logs, or inmates receiving the wrong medication. The BHS Defendants ignored the statistics and the dangers and refused to alter the procedures used at [Waupun] because it was cost effective to use correctional staff.

The BHS defendants were aware of the general problem of using officers in this fashion and the specific problems the Plaintiff suffered and in a display of deliberate indifference to his serious medical needs they failed to act, in violation of the Eighth Amendment.

Each of the [Waupun] Defendants were personally notified of the systemic problem and despite being in a position to take remedial action they repeatedly failed to act, fully aware that the cycle would continue, in a display of deliberate indifference to the Plaintiff's serious medical needs in violation of the Eighth amendment.

The [Waupun] Defendants, from the Warden on down, were also in a supervisory position over the staff who were repeatedly charged with the task of investigating the officers and sergeants who were the subject of the complaints, the task of conducting further training and of implementing audits and various systems of checks and balances reported via the ICRS [Inmate Complaint Review System]. Upon information and belief, in that capacity the [Waupun]

27

Defendants repeatedly failed to follow up with their subordinates who were tasked with conducting further training and implementing new policies to ensure that the training was being carried out and that the policies were being implemented and they repeatedly failed to take any remedial action against not only the line staff who are directly causing the issues but also the HSU, BHS, and Security staff when their purported efforts proved to be nothing but lip service.

Id. at ¶¶130-36. The plaintiff requests declaratory relief as well as nominal, compensatory and punitive damages. Id. at 34.

## III.  Analysis

The Eighth Amendment imposes a duty on prison officials to provide humane conditions of confinement by ensuring that incarcerated persons receive adequate food, clothing, shelter and medical care. Farmer v. Brennan, 511 U.S. 825, 832 (1994). To state a claim under the Eighth Amendment, a plaintiff must allege that prison officials were "deliberately indifferent" to a substantial risk of serious harm to inmate health or safety. Id. at 834.

Prison officials act with deliberate indifference when they know of a substantial risk of serious harm and either act or fail to act in disregard of that risk. Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011). A medical need is considered sufficiently "serious" if the incarcerated person's condition "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." Id. (quoting Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005)).

The plaintiff alleges that since 2004, he has been prescribed medication by a psychiatrist to treat his depression, anxiety and insomnia and that, as of 2017, he had missed over 4000 doses of medication. Dkt. No. 43-1 at ¶2. He

28

also alleges that the hundreds of separate instances of abrupt unavailability of his medication caused him to experience "insomnia, migraine headaches, severe nausea, suicidal ideations and a complete disruption to his emotional well-being and mental health, in addition to an exacerbation of his underlying symptoms of depression, insomnia and anxiety." Id. at ¶3. The plaintiff has sufficiently alleged that he has suffered from a serious medical need. See Gutierrez v. Peters, 111 F.3d 1364, 1371 (7th Cir. 1997); Sanville v. McCaughtry, 266 F.3d 724, 734 (7th Cir. 2001).

The defendants' alleged lack of action regarding the policy that allegedly caused the abrupt unavailability of the plaintiff's medication could amount to deliberate indifference, if the defendants knew about the plaintiff's medical needs yet "turned a blind eye" to the policy that caused the unavailability of his medication. See Perez v. Fenoglio, 792 F.3d 768, 782 (7th Cir. 2015); Sanville, 266 F.3d at 740.

The plaintiff alleges that each defendant, whom he sues in his or her individual capacity, knew that Waupun's policy of correctional officers distributing medication, maintaining medication records and issuing refill slips to the HSU violated his constitutional rights. He says the policy caused him to miss thousands of medication doses between 2004 and 2017 and that each defendant knew he had filed multiple inmate complaints about not receiving his prescribed medications. The plaintiff alleges that the defendants continued this policy fully aware that the only remedy was to use nursing staff, instead of correctional officers, to distribute medication.

Case 2:18-cv-01830-PP   Filed 03/23/23   Page 29 of 39   Document 53

The plaintiff also alleges that certain defendants are liable because they failed to take remedial action to improve the training of the officers who dispensed medication and that, if the correctional officers had been properly trained and supervised, the number of "unavailable" doses of medication the plaintiff experienced would have been "significantly less." The plaintiff contends that while all defendants knew that Waupun's policy using correctional officers to distribute medication was "constitutionally-infirm," some defendants are liable for not changing the policy to one in which medical staff distributed medication and some defendants are liable for not addressing issues with the existing policy by improving officer training and taking other remedial action. The court addresses below whether the plaintiff states a claim against each defendant, individually.

A.    Bureau of Health Services Defendants

1.    *Alsum*

The plaintiff claims that BHS Regional Nursing Coordinator Alsum's failure to act after receiving copies of the plaintiff's inmate complaint or acting as the reviewing authority on several of the plaintiff's inmate complaints from 2012 to 2017 constitutes deliberate indifference. The plaintiff alleges, however, that Alsum *did act* in response to the plaintiff's complaints. She allegedly forwarded some of the complaints to supervisory staff, she affirmed some of the complaints and she recommended that a plan be developed to eliminate the medication delivery issues, among other things. The plaintiff has not alleged that Alsum had the authority to change the Waupun policy that correctional

30

staff distribute medications, nor has he alleged that she failed to act in response to his complaints. The plaintiff has not stated a claim against Alsum.

### 2. *Burnett, Greer and Holzmacher*

The plaintiff claims that BHS Medical Director Burnett, his successor Holzmacher and Director Greer failed to act to change Waupun's policy of having officers distribute medications. He alleges that Burnett, Greer and Holzmacher failed to take any action despite being aware of the dangers of using correctional staff to distribute medication and maintain med logs as well as the ongoing problem at Waupun and with the plaintiff. The plaintiff alleges that HSU Manager Schrubbe asked Burnett, Greer and Holzmacher to change the policy. The plaintiff has stated sufficient facts to allow him to proceed on his Eighth Amendment claim against Burnett, Greer and Holzmacher.

### B. <u>Waupun Correctional Institution Defendants</u>

### 1. *Bauer*

The plaintiff alleges that Security Captain Bauer was contacted at least five times between 2011 and 2017 regarding the non-delivery of the plaintiff's medications. He claims that Bauer failed to act to address the situation. The plaintiff has not alleged, however, that Bauer had the authority to change Waupun's policy of having officers distribute medication. While the plaintiff alleges that Bauer was sent copies of several complaints, he has not alleged how Bauer's alleged failure to act amounted to deliberate indifference. He has not alleged that Bauer had any authority regarding the policy at issue. The plaintiff has not stated a claim against Bauer.

31

## 2. *Cooper*

The plaintiff alleges that Deputy Warden Cooper received copies of three complaints about the plaintiff's issues receiving his medication and that she failed to follow up with her subordinates to ensure that staff had conducted training and implemented a system of checks and balances. The plaintiff does not allege that Cooper had the authority to change Waupun's policy of having officers distribute medication. Although the plaintiff alleges that Cooper received a copy a complaint that directed Waupun's Security Director to conduct further review and staff training, and that she failed to supervise and follow up with staff on the training and on implementing a system of checks and balances, he has not alleged that Cooper was involved with the alleged failure to train or implement the system. The plaintiff alleges that Cooper did not learn that Waupun had failed to train officers and implement the system of checks and balances until 2017, which was one to two years *after* she received the complaints. The plaintiff has not stated a claim against Cooper. See Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2011); Burks v. Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009); Hildebrandt v. Ill. Dep't of Natural Resources, 347 F.3d 1014, 1039 (7th Cir. 2003).

## 3. *Foster*

The plaintiff claims that Warden Foster's failure to act constitutes deliberate indifference to the plaintiff's serious medical needs. While the plaintiff does not allege that Foster had the authority to change the policy, he alleges that Foster didn't do enough or didn't properly supervise staff who were

directed to take certain actions to improve the existing policy. Section 1983 limits liability to public employees who are personally responsible for a constitutional violation. Burks, 555 F.3d at 595-96. For liability to attach, the individual defendant must have caused or participated in a constitutional violation. Hildebrandt, 347 F.3d at 1039. Regarding supervisors, the personal responsibility requirement is satisfied if the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent. Id. In other words, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." Id. (quoting Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995)).

Although the plaintiff alleges that the actions Waupun staff took to improve the policy did not work, he has not alleged that Foster condoned or turned a blind eye to the problems with the policy. Rather, the plaintiff alleges that Foster talked to the corrections complaint examiner and informed her that Waupun had instituted a process of checks and balances to ensure that officers were processing and documenting med passes, and that Foster subsequently affirmed a complaint that directed Captain Haynes to conduct further review of medication sheet documentation. The plaintiff alleges that Foster didn't do enough and describes how Foster could have more effectively improved the existing policy. The plaintiff has not alleged, however, that Foster turned a blind eye to the deficiencies in the policy of which he was aware. The plaintiff has not stated a deliberate indifference claim against Foster.

####           4.    *Meisner*

The plaintiff alleges that Deputy Warden Meisner was contacted in 2009 because of the plaintiff's twenty-fifth medication-related complaint and that he failed to ensure that his subordinates conducted more training and developed a tracking system. Dkt. No. 43-1 at ¶81. The plaintiff has not alleged that Meisner had the authority to change Waupun's policy of having officers distribute medication. Although the plaintiff alleges that Meisner failed to supervise his subordinates to ensure that they conducted more staff training and developed a tracking system, he has not alleged that Meisner had personal involvement in his subordinates' alleged failures. The plaintiff has not stated a claim against Meisner.

####           5.    *Meli*

The plaintiff alleges that Anthony Meli, Security Captain and then Security Director at Waupun, failed to investigate several instances of the plaintiff's failure to receive his medication and to resolve the problems with the policy of officers distributing medication. The plaintiff has not alleged that Meli had any authority to change the policy that officers distribute medication to inmates. Nor may the plaintiff proceed against Meli based solely on any individual instances of missing his medication because such allegations are outside the scope of this case. The plaintiff has alleged, however, that Meli knew about the issues with Waupun's medication policy, had several opportunities to address the problems and failed to do so. Specifically, the plaintiff alleges that Meli failed to review the medication delivery and

documentation process in February 2012 (Dkt. No. 43-1 at ¶86), failed to follow up on staff training the proper documentation of med logs in November and December 2015 (id. at ¶92), failed to conduct further review and training with respect to officers properly documenting the med logs in May 2016 (id. at ¶93), and failed to evaluate the medication issue with the goal of eliminating the recurring problem in November 2016 (id. at ¶94). At this stage, the plaintiff has alleged sufficient facts to allow the plaintiff to proceed on a deliberate indifference claim against Meli.

      6.    *Pollard*

      The plaintiff alleges that after Warden Pollard affirmed two inmate complaints where it appeared that an officer intentionally withheld the plaintiff's medication, he failed to supervise his captains to ensure they conducted further investigation. He also alleges that Pollard failed to have his subordinates address the issues with the plaintiff's medication problems after he received a copy of an affirmed complaint in February 2012 describing the plaintiff's history of medication problems. The plaintiff has not alleged that Pollard had authority to change Waupun's policy of using officers to distribute medication. The plaintiff alleges that Pollard failed to ensure that his subordinates addressed the issue and the court cannot infer that Pollard himself turned a blind eye to the plaintiff's problems with receiving his medications based on the policy. The plaintiff's allegations against Pollard do not state a claim for deliberate indifference. The court will dismiss Pollard.

### 7. *Strahota*

The plaintiff alleges that Strahota, Waupun's Security Director and later Deputy Warden, failed to address the problems with Waupun's medication delivery system after receiving copies of the plaintiff's inmate complaints from 2006 to 2009 and in 2012, that described the problems. The plaintiff does not allege that Strahota had authority to change the policy that correctional officers distribute medication. He does allege, however, that Strahota failed to take action to address issues with the policy when requested to do so in December 2008 (dkt. no. 43-1 at ¶¶110-11), June 2009 (id. at ¶113), and February 2012 (id. at ¶114). The plaintiff has alleged sufficient facts to allow him to proceed on a deliberate indifference claim against Strahota based on Strahota's alleged failure to take action to address problems with the policy on those dates.

### 8. *Thurmer*

The plaintiff alleges that Thurmer, the reviewing authority for five of the plaintiff's complaints, failed to act in response to complaints alleging that the plaintiff did not receive his medication. The plaintiff has not alleged that Thurmer had the authority to change the policy of using officers to dispense medications. The plaintiff's allegations that Thurmer failed to act in response to the plaintiff's specific complaints do not state a claim for relief. Although the plaintiff alleges that Thurmer received copies of complaints, he has not alleged how Thurmer's failure to act amounted to deliberate indifference. The plaintiff has not stated a deliberate indifference claim against Thurmer.

Case 2:18-cv-01830-PP   Filed 03/23/23   Page 36 of 39   Document 53

9.  *Westra*

The plaintiff alleges that Captain Westra failed to act after being contacted five times between 2016 and 2017 about the plaintiff's medication issues. The plaintiff has not alleged that Westra had any authority to change Waupun's policy that officers distribute medication. He alleges that twice Westra failed to follow up with staff about properly filling out med logs. The plaintiff also alleges that Westra did not respond to the plaintiff's requests for assistance after the plaintiff did not receive his medication. These allegations do not relate to the plaintiff's claim that Waupun's policy was deficient. The plaintiff has not stated a claim against Westra.

C.  <u>Summary</u>

The court will grant the plaintiff's motion to amend the complaint. The plaintiff may proceed on an Eighth Amendment claim against individual defendants Burnett, Greer and Holzmacher based on allegations that they failed to change the policy of having officers distribute medications despite being aware of the dangers of using correctional staff to distribute medication and maintain med logs as well as the ongoing problem at Waupun and with the plaintiff. In addition to the plaintiff's claims based on the failure to change the policy, the plaintiff may proceed against individual defendants Meli and Strahota based on their alleged failure to address problems with Waupun's policy that the plaintiff says would have drastically reduced the number of missed medications. Specifically, the plaintiff may proceed on an Eighth Amendment claim against Meli that he failed to review the medication delivery

37

and documentation process in February 2012 (dkt. no. 43-1 at ¶86), failed to follow up on staff training the proper documentation of med logs in November and December 2015 (id. at ¶92), failed to conduct further review and training with respect to officers properly documenting the med logs in May 2016 (id. at ¶93), and failed to evaluate the medication issue with the goal of eliminating the recurring problem in November 2016 (id. at ¶94). The plaintiff may proceed on an Eighth Amendment claim against Strahota that he failed to take action to address issues with the policy when requested to do so in December 2008 (id. at ¶¶110-11), June 2009 (id. at ¶113), and February 2012 (id. at ¶114).

The plaintiff may not proceed on any claims other than those described in the two preceding paragraphs. The court will dismiss the remaining defendants.

Finally, the plaintiff's motion to compel is based on a prior complaint. Because this order screens the plaintiff's third amended complaint and dismisses several defendants, the court will deny without prejudice the plaintiff's motion to compel. After the defendants have answered the third amended complaint, the court will issue a scheduling order setting new deadlines for the parties to complete discovery and file dispositive motions.

## IV. Conclusion

The court **GRANTS** the plaintiff's motion to amend. Dkt. No. 43.

The court **DIRECTS** that the clerk's office to docket the proposed amended complaint at Dkt. No. 43-1 as the Third Amended Complaint; this will be the operative complaint going forward. The plaintiff may proceed on Eighth

Amendment claims against Burnett, Greer, Holzmacher, Meli and Strahota on the claims described above.

The court **DIRECTS** the clerk's office to add defendants David Burnett, James Greer and Ryan Holzmacher to the docket.

The court **ORDERS** that defendants Alsum, Cooper, Bauer, Foster, Meisner, Pollard, Thurmer and Westra are **DISMISSED**.

Under an informal service agreement between the Wisconsin Department of Justice and this court, the court will electronically transmit a copy of the third amended complaint and this order to the Wisconsin Department of Justice for service on defendants Burnett, Greer and Holzmacher. Under the informal service agreement, the court **ORDERS** defendants Burnett, Greer, Holzmacher, Meli, and Strahota to file a responsive pleading to the third amended complaint within sixty days.

The court **DENIES WITHOUT PREJUDICE** the plaintiff's motion to compel. Dkt. No. 50.

The court **ORDERS** that the parties must not begin discovery regarding the new defendants until after the court enters a scheduling order setting deadlines for completing discovery and filing dispositive motions.

Dated in Milwaukee, Wisconsin this __ day of March 2023.

**BY THE COURT:**

_____

**HON. PAMELA PEPPER**
**Chief United States District Judge**