UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSHUA HOWARD,

                              Plaintiff,

        v.                                              Case No. 18-cv-1830-pp

ANTHONY MELI, *et al.*,

                              Defendant.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(DKT. NO. 64) AND DISMISSING CASE**

        The plaintiff, who currently is incarcerated at Fox Lake Correctional Institution and is representing himself, filed this lawsuit challenging the way medication is distributed at Waupun Correctional Institution, where he previously was incarcerated. He says that he has missed thousands of doses of medication since 2004 and that the defendants' failure to change the medication distribution procedures violated his rights under the Eighth Amendment. On December 22, 2023, the defendants filed a motion for summary judgment. Dkt. No. 64. This order grants the defendants' motion and dismisses the case.

**I.      Procedural Background**

        On March 23, 2023, the court granted the plaintiff's motion to amend the complaint and held that the third amended complaint (Dkt. No. 54) is the operative complaint. Dkt. No. 53. The court allowed the plaintiff to proceed on an Eighth Amendment claim against defendants David Burnett, James Greer

1

and Ryan Holzmacher based on allegations that they failed to change Waupun's policy of having corrections officers distribute medications to incarcerated individuals despite being aware of the dangers of using correctional staff to distribute medication and maintain med logs as well as an ongoing problem at Waupun and with the plaintiff. Dkt. No. 53 at 37.

The court also allowed the plaintiff to proceed against defendants Anthony Meli and Donald Strahota based on their alleged failure to address problems with Waupun's policy that the plaintiff says would have drastically reduced the number of missed medications. Id. Regarding Meli, the court allowed the plaintiff to proceed on an Eighth Amendment claim that Meli failed to review the medication delivery and documentation process in February 2012 (dkt. no. 54 at ¶86), failed to follow up on staff training for the proper documentation of med logs in November and December 2015 (id. at ¶92), failed to conduct further review and training with respect to officers properly documenting the med logs in May 2016 (id. at ¶93) and failed to evaluate the medication issue with the goal of eliminating the recurring problem in November 2016 (id. at ¶94). Regarding Strahota, the court allowed the plaintiff to proceed on an Eighth Amendment claim that Strahota failed to take action to address issues with the policy when asked to do so in December 2008 (id. at ¶¶110-11), June 2009 (id. at ¶113) and February 2012 (id. at ¶114). Dkt. No. 53 at 37-38.

On December 22, 2023, the defendants filed a motion for summary judgment. Dkt. No. 64. After litigation regarding the plaintiff's deadline for filing

2

a reply and demands for discovery, the plaintiff filed his response on July 29, 2024, dkt. nos. 84-87, and the defendants filed their reply on August 21, 2024, dkt. no. 92-93.

## II. Defendants' Motion for Summary Judgment

### A. Defendants' Facts[1]

#### 1. *The Parties*

As stated above, the plaintiff currently is incarcerated at Fox Lake Correctional Institution. Dkt. No. 65 at ¶1. He was housed at Waupun Correctional Institution from July 2, 2002 through October 13, 2017. Id.

Defendants David Burnett, James Greer, Ryan Holzmacher, Anthony Meli, and Donald Strahota are, and were during the times relevant to this case, citizens of the State of Wisconsin. Dkt. No. 65 at ¶2. Defendant Greer was the director of the Wisconsin Department of Corrections' (DOC) Bureau of Health Services (BHS) from November 18, 2002 until his retirement on October 2, 2019. Id. at ¶3. As director of the BHS, Greer's responsibilities included developing and implementing policies for delivery of health services, preparing budgets, directing staff and reviewing inmate complaints regarding the provision of health services at the correctional institutions. Id. at ¶4. He did not discipline, hire or interact with correctional officers unless it was for training regarding the DOC's policy or practice on the delivery of medications. Id. Greer also did not have direct contact with incarcerated individuals. Id. Defendants

---

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

3

Burnett and Holzmacher worked as medical directors at the BHS during the times relevant to this case. Id. at ¶¶11-12.

Defendant Meli worked at Waupun as a lieutenant from March 2001 to July 2006, as an administrative captain from 2006 to 2012 and as security director from January 2012 to August 2019. Id. at ¶5. Defendant Strahota was the security director at Waupun from April 30, 2006 to August 23, 2011. Id. at ¶6. He was the deputy warden there from August 24, 2011 to February 20, 2016. Id.

Belinda Schrubbe (not a defendant) worked as the manager of Waupun's Health Services Unit (HSU) from December 9, 2001 to February 27, 2015. Id. at ¶7. Schrubbe is licensed as an advance practice nurse prescriber and a registered nurse in the State of Wisconsin. Id. at ¶8.

2.    *The Policies*

The DOC's long-standing policy and practice at most Division of Adult Institutions (DAI) institutions, other than Taycheedah Correctional Institution,[2] has been for correctional officers to deliver medications to incarcerated individuals as part of their normal job duties (other than Schedule II and Schedule III narcotics which are administered by nursing staff). Dkt. No. 65 at ¶9. The defendants did not have the authority to change the DOC's policy or

_____

[2] Taycheedah Correctional Institution's policy changed in 2006 when nursing staff began to deliver medications. Dkt. No. 65 at ¶15. The policy changed because a lawsuit was filed against the institution involving the issue of medication delivery. Id. Greer was not involved with this lawsuit but it was his understanding that in response to the lawsuit, the institution was given funding by the legislature to hire more nursing staff so medications could be delivered by nurses. Id.

4

procedure on medication delivery.[3] <u>Id.</u> at ¶10. Greer regularly worked with the Division of Adult Institutions to recommend new policies and procedures to the DOC's Office of the Secretary in an effort to improve the healthcare treatment of incarcerated individuals. <u>Id.</u> It was the Wisconsin legislature, however, that had the final authority in creating policies and procedures. <u>Id.</u> As subordinates within the BHS, defendants Holzmacher and Burnett would not have had authority to change Division of Adult Institutions policy or procedures or to appropriate funding for additional nursing staff throughout the DOC. <u>Id.</u> at ¶11.

If it chose to, an institution could make its own policies and procedures more specific to the institution, in addition to the Division of Adult Institutions policies or procedures in effect, but the institution could not trump the DAI's policies and procedures. Dkt. No. 65 at ¶12. As director of the BHS, Greer's involvement in separate institution policies was only to review them to make sure they conformed with Division of Adult Institutions policies and procedures in effect at that time. <u>Id.</u> at ¶13. Meli and Strahota, as security directors at Waupun, only had input into security-related polices; they did not finalize any procedure or policy. <u>Id.</u> In her role as the HSU manager, Schrubbe did not oversee the correctional officers, nor did she have the authority to change the DOC's practice on medication delivery. <u>Id.</u> at ¶14.

---

[3] The plaintiff states that when he transferred to Green Bay Correctional Institution in October 2017, nursing staff dispensed and refilled "controlled medication." Dkt. No. 86 at ¶9.

5

When incarcerated individuals enter Waupun, they receive an Inmate Handbook informing them of the institution's rules, policies and procedures. Dkt. No. 65 at ¶16. The 2010 Waupun Correctional Institution Rules & Information Handbook directs incarcerated individuals to keep track of their controlled and non-controlled medication and how much they have available. Id. The handbook instructs incarcerated persons on how to obtain refills, as follows:

> 1. Complete a medication refill request (DOC-3035C) and place it in the HSU box 5 days prior to being out of the medication, controlled and non-controlled.
>
> 2. If you don't receive your medication 2 days prior to running out, write to the HSU manager using a Health Services Request (DOC-3035). Fold the Health Services Request and put on the outside, "For HSU Manager Only – MED" Place in HSU box.
>
> 3. The day prior to running out, if you still haven't received your medication, ask the Sergeant in your cell hall to call the HSU Manager.
>
> HSU responds to every written medication request in writing. If you have received a response back informing you that your medication was sent, ask the Sergeant for it if it is non-controlled. If the medication is controlled, it has been placed in the mediation cart in back-up. If you do not receive a response back, HSU did not receive your request.

Id.

The handbook also informs incarcerated individuals that if they require non-emergency medical attention, they must submit a Health Services Request to the HSU. Dkt. No. 65 at ¶17. If an incarcerated person needs to see medical staff immediately (what the defendant's characterize as "emergency-type situations"), the incarcerated person needs to alert unit staff of his problem or

6

concern. Id. Incarcerated individuals may ask to see HSU by checking the box on the Health Services Request (HSR) that indicates their desire to see health services staff. Id. at ¶18. The individual may indicate that he does not need to see health services staff by checking the corresponding box. Id. HSU staff triage all health requests received on a daily basis. Id. at ¶19. If the request is urgent or emergent in nature, arrangements will be made for a same day appointment, if possible, for evaluation by a health care provider. Id.

If an incarcerated individual feels he needs to be seen right away, he may go to "sick cell." Dkt. No. 65 at ¶20. Sick cell means that the individual should be seen by the nurses so that they can determine if he should be seen by a doctor. Id. During sick call, qualified health care professionals make timely assessments, provide treatment and schedule for follow-ups according to approved protocols and clinical priorities. Id.

Based on Schubbe's review of the plaintiff's medical file, the plaintiff did not submit refill requests or notify HSU about not receiving his refills prior to his medications running out. Dkt. No. 65 at ¶22. Often, he did not submit his refill requests to HSU until several days or even weeks had passed without his medications. Id. The refill requests he *did* send directly to the HUS were refilled and dispensed "to the cell hall" in a timely manner. Id. The plaintiff has a shared responsibility to take an active role in his health care and request refills of his medications as stated in the 2010 handbook and as he was directed to do numerous times. Id. at ¶23. While Schrubbe was employed at Waupun, there was no system in place for HSU to track whether officers were requesting

7

timely refills of the officer-controlled medications. Id. HSU is not aware of a lapse in medications unless an incarcerated individual or security staff brings it to HSU staff's attention. Id.

Waupun's HSU took steps to educate the plaintiff on how he could avoid missing medication doses, including timely filling out refill requests and submitting health service requests when he missed any doses, but the plaintiff repeatedly ignored the HSU guidance. Dkt. No. 65 at ¶24. He would file inmate complaints instead of health service requests, which is not how he would have been getting medication refills. Id. This made the medical staff believe that the plaintiff was not interested in getting timely refills and that he had ulterior motives, such as setting up future lawsuits. Id. According to Schrubbe, of the thousands of incarcerated individuals that HSU staff served during the years she worked at Waupun, the plaintiff was the only person who consistently had issues with medication delivery, despite Waupun staff taking measures to accommodate him specifically. Dkt. No. 65 at ¶25.

3. *Complaints*

Greer continuously monitored inmate complaints at each institution to see how processes could be improved. Dkt. No. 65 at ¶26. Most complaints related to an incarcerated individual thinking he was not being seen by HSU in a timely manner, being charged a copay or not receiving the medical care he thought he should receive. Id. The HSU reported directly to the warden, not the BHS. Id. at ¶27. Inmate complaints regarding medical issues were sent to the

HSU manager for handling. Id. Greer would see the complaints only if the issue could not be resolved at the HSU level, which was unusual. Id.

When the warden assigned to Meli inmate complaints regarding medication delivery issues, Meli would direct the security supervisor in that particular housing area to investigate the inmate complaint. Dkt. No. 65 at ¶28. The security supervisor would then report his findings to Meli. Id. After reviewing the findings from the security supervisor, Meli would direct him or her to follow up with staff to correct the issue and/or follow up with the warden. Id. In the rare instance when an inmate complaint was not addressed, Meli would follow up with the security supervisor who was assigned to the complaint to determine why the issue was not corrected. Id. at ¶30.

When the warden assigned inmate complaints to Strahota, Strahota would direct the supervisor (a captain or lieutenant) in that particular cell hall to investigate the complaint. Dkt. No. 65 at ¶29. The supervisor would then report his findings to Strahota. Id. After reviewing the supervisor's findings, Strahota would direct the supervisor to follow up with staff to correct the issue and/or he would follow up with the Warden. Id. Depending on the nature of the complaint, a variety of things could be done to resolve the issue. Id. at ¶31. There was, however, no mechanism for showing the results of what follow-up might have been completed. Id.

By the time an inmate complaint reached Meli's desk, it usually would be one to two weeks after the alleged incident. Dkt. No. 65 at ¶32. If the incarcerated person did not provide the name of the correctional officer in his

9

complaint—which was usual—Meli could only infer who the correctional officer was by looking at the schedule from the time of the alleged incident.[4] Id. With regard to incorrect documentation of the medication log, it was almost impossible to be sure whether Meli found the person who allegedly documented the medication in the log incorrectly. Dkt. No. 65 at ¶33. There could be one to three different staff members on a given day who performed a given medication pass. Id. If they did not document the medication properly in the log, Meli would ask each of them who did the specific medication pass but if they did not remember, Meli would not know who incorrectly documented the medication. Id.

        4.    *Medication Delivery*

Prior to the electronic medical record system that the DOC implemented in 2019, correctional officers delivered controlled medications and documented compliance on a DOC-3026 "Medication Treatment Record." Dkt. No. 65 at ¶36. The DOC-3026 is maintained in each incarcerated individual's medical file. Id. Depending on the type of medication and an individual's housing status, an incarcerated individual may have some self-administered medication in his cell to take as needed. Id. at ¶37. Psychotropic medications, such as Fluoxetine and Paroxetine, are officer-controlled to document compliance and to prevent the risks of an individual overdosing or selling these types of drugs to other incarcerated persons to whom they are not prescribed. Id. The

---

[4] The plaintiff states that this is not accurate because the med logs require each officer to sign his name and initial it, which would make it impossible not to be able to identity the officer. Dkt. No. 86 at ¶32.

controlled medications come in a blister pack. Id. Incarcerated individuals who are in restrictive housing (formerly known as segregation) will be delivered their controlled medication directly to their cell during medication pass times. Dkt. No. 65 at ¶38. Individuals in general population may report to the designated area on the unit to receive their controlled medication when medication pass is called on the unit. Id.

If the incarcerated person is compliant in taking his medication, the staff member initials the appropriate box on the form. Dkt. No. 65 at ¶39. Staff also must document on the DOC-3026 if the individual refuses the medication, if he is absent at the time of delivery, if the medication is unavailable at the time of delivery, if the medication is withheld per instructions from HSU or if the medication is sent with the individual offsite for reasons such as work or an offsite appointment. Id. For instance, an "R" should be written in the appropriate box if an incarcerated individual reported to the designated area and refused to take his medication. Id. An individual may refuse to take any medication and security staff cannot force him to take his medication. Id. Officers must show the medication container/package and label to the incarcerated individual for him to verify the information is correct prior to the delivery of the medication. Id. at ¶40. If there is a discrepancy between the medication label and the DOC-3026, the officer should contact a nurse for direction before proceeding with delivery. Id. at ¶41.

According to the defendants, there are many reasons an incarcerated individual might not receive his medication. Dkt. No. 65 at ¶42. For example, if

an incarcerated individual refused to take his medication more than five times, the medication card was returned to the HSU so the medication could be returned to Central Pharmacy Services. Id. In that case, the medication card no longer would be on the cart for the correctional officer to provide the individual.[5] Id. Also, an incarcerated person cannot be forced to take their medication and could refuse the medication at any time. Id.

It was the incarcerated individual's responsibility to refill his medications as needed by completing form DOC-3035C, Medication/Medical Support Refill Request. Dkt. No. 65 at ¶43. Greer recollected that the plaintiff was not completing Form DOC-3035C but was expecting the correctional officers to complete it, even though it was not their responsibility. Id. at ¶44.

According to the defendants, Meli recalls being informed by security supervisors that correctional staff reported that the plaintiff would refuse his medication for a period of five days, so his card was sent back to the HSU. Dkt. No. 65 at ¶45. By the plaintiff not taking his medication, he would miss it because the medication was no longer on the cart per policy.[6] Id.

---

[5] The plaintiff objects to this fact and states that there was not a policy at Waupun where "an officer has the ability to take away an inmate's medication and send it back to the pharmacy." Dkt. No. 86 at ¶42. According to the plaintiff, the DAI policy states that "if an inmate refuses his medication for 3 or more consecutive days, the officer is to inform HSU, who then consult the inmate and if they have no intention of taking it, HSU can have the medication withheld by the officer until the doctor discontinues the medication." Id. .

[6] The plaintiff states that this policy referenced by the defendants does not exist. Dkt. No. 86 at ¶45.

While conceding that sometimes there were minor issues with medication delivery, Greer did not believe incarcerated individuals missing their medications was a big issue within the Division of Adult Institutions.[7] Dkt. No. 65 at ¶46. Medication delivery generally went smoothly during Meli's time at Waupun, and he does not recall that incarcerated persons missing their medications was a big issue. Id. at ¶47. While Strahota does not specifically recall the incidents at issue in this lawsuit because they occurred over ten years ago, he does not recall that incarcerated individuals missing their medications was a big issue within the institution. Dkt. No. 65 at ¶48.

5. *Training*

According to DAI Policy 500.80.11, all correctional officers are trained on medication delivery upon hire and then annually at their assigned facility if their job duties include medication delivery. Dkt. No. 65 at ¶49. The training includes, at a minimum, "the importance of (1) providing medication to the right inmate patient; (2) the inmate receiving their proper medication; (3) the inmate receiving the right dose of the medication; (4) the inmate knowing the right method of taking the medication; and (5) the inmate receiving the medication at the right time." Id. The training was completed by the nursing

---

[7] The plaintiff states that this fact is inconsistent with Greer's statement (DPFF 54) that he fought to get approval to replace officers with nursing staff. Dkt. No. 86 at ¶46. The plaintiff also asserts that "Greer has acknowledged the fact that he was informed about the medication delivery process at WCI and issues pertaining to the plaintiff and Schrubbe testified that she repeatedly pleaded with BHS for help." Id.

13

staff in HSU. Dkt. No. 65 at ¶50. Meli does not specifically recall if he ever helped with training on the issue of medication delivery. Id.

The training eventually became an online training course through a computer program called Cornerstone. Dkt. No. 65 at ¶51. Waupun's training supervisor was responsible for ensuring all correctional staff took the required training. Id. When the training was completed, it would be recorded in Cornerstone, so the training supervisor could ensure each correctional officer completed the required training. Id.

6. *Improvements*

In January 2019, the DOC successfully implemented an electronic medical record (EMR) system, which included bar coding technologies for medication administration. Dkt. No. 65 at ¶52. With the new EMR system, all medications are barcoded and each incarcerated individual wears an identification tag, which also is barcoded. Id. The barcodes allow staff to compare the medication being delivered with what was ordered for the individual to ensure the individual is receiving the right medication and dosage at the right time. Id. If the barcodes do not match, the system will alert the correctional officer. Id. If the correctional officer receives an alert, he is required to notify the HSU prior to delivering the incarcerated person his medication. Id.

Greer was directly involved in the EMR system implementation. Dkt. No. 65 at ¶53. This system greatly improved the medication delivery process and minimized mistakes, including the medication not being properly charted in the medication log. Id. It immediately gave HSU staff more healthcare information

14

about an incarcerated individual instead of them having to wait for the paper chart. Id. This allowed HSU staff to timely help with correctional officers' questions on medication administration. Id. HSU staff also were able to print out relevant portions of an incarcerated person's medical chart to give to the security officer when the individual was being transported to an offsite appointment. Id. The security officer then could provide the chart to the offsite provider allowing medications to be timely and correctly given. Id.[8]

Greer also fought to get approval for additional healthcare staff, so that nurses could distribute incarcerated individuals' medications instead of the correctional officers. Dkt. No. 65 at ¶54. Every time he was requested to submit a budget, he would ask for more money so HSU could hire more nursing staff. Id. Greer also requested that institutions have a nurse in the HSU twenty-four hours, instead of having an on-call nurse, to better provide healthcare to individuals. Id. The funds for that needed to be approved by the legislature, however, and Greer was unable to get approval for such funding. Id. Greer was not able to unilaterally approve funding for the additional nurses that would have been needed to have only nurses distribute medications; this funding likely would have been in the millions of dollars per budget. Id. at ¶55.

To minimize the inmate complaints and resolve the issues, Meli started requiring security supervisors to review the medication log on a weekly basis to

---

[8] The plaintiff states that the fact that the DOC implemented an EMR using technology that grocery and retail stores were using thirty years ago is not relevant to this case because the plaintiff left Waupun in 2017 (with the system being implement in 2019). Dkt. No. 86 at ¶53.

15

make sure the log was completed correctly. Dkt. No. 65 at ¶56. Meli also began requiring the incarcerated individual receiving the medication to go to the sergeant's station, so the sergeant could monitor the correctional officer handing out the medication and make sure the medications were documented properly in the medication log. Id. Eventually, after the EMR was implemented and the correctional officers were required to scan the identification card to document the medication, all medications were delivered directly to the incarcerated person at his cell front. Id.

B.    Plaintiff's Facts

From May of 2002 until October of 2017, while incarcerated at Waupun, the plaintiff "filed (88) medication related complaints." Dkt. No. 85 at ¶2. The plaintiff states that when he missed his medication, depending on which medication or combination of medications were not available, he would experience migraine headaches, body aches, nausea and on the rare occasion, suicidal ideations. Id. at ¶4.

DAI Policy 500.80.11 states that when an incarcerated individual refuses his medication the officer should write "R" on the med log and if any medication is refused on three consecutive days, the officer should draw a circle around the "R" to reflect that he or she has contacted HSU to report the pattern of refusals. The officer also is required to file a DOC-2466 incident report. Dkt. No. 85 at ¶5. The plaintiff states that he refused his medication for several days in a row in "a few instances." Id. at ¶6. He states, for example, that after his Bupropion medication had not been available for a particularly

16

long period, when it became available, he refused to take it out of concern of having to experience another episode of withdrawal. Id. The plaintiff also states that he refused his mental health medication if he was trying a new medication and the side effects disagreed with him. Id. In addition, in 2015, he refused his pain medications because the combination was causing him to gain weight. Id.

###### 1. *Medication Problems*

At the plaintiff's October 2021 federal trial in Case No. 15-cv-557-BHL—which concerned medication delivery—HSU Manager Schrubbe testified that security staff was responsible for requesting medication refills per Waupun policy. Dkt. No. 85 at ¶7. She also testified that the plaintiff was responsible for ordering refills and that the plaintiff had received training on ordering medication refills.[9] Dkt. No. 93 at ¶7.

According to the plaintiff, Schrubbe testified at the 2021 trial that the medication lapses were not the fault of HSU, but were the result of security staff not doing what they were supposed to do and that she talked to the

---

[9] The plaintiff states that his medication records show that out of the 4,287 missed doses of medication, less than 12%—or 504—were the result of a delayed refill. Dkt. No. 85 at ¶8. The plaintiff cites no evidence in support of this proposition beyond his own conclusory allegations and his "records," but he has not produced those records or explained how he generated the finalized numbers. The court will not consider this fact at summary judgment. See Fed. R. Civ. P. 56(c), (e); Civil Local Rules 56(b)(1)(C), (b)(2)(B), (b)(4) (E.D. Wis.).

The plaintiff references Exhibit 2001, a table he created to show that he missed 4,287 doses of medication. Dkt. No. 85-1 at 139. The plaintiff has not authenticated Exhibit 2001, nor has he provided evidence to support it. The court will disregard this exhibit and all facts that rely on it. Through Exhibit 2001, the plaintiff has not submitted admissible evidence regarding the number of medication doses he missed, or the reason.

17

defendants about the problem multiple times. Dkt. No. 85 at ¶10. The defendants state that there is no dispute that Schrubbe testified that she had "brought the issue of security not requesting refills timely to the attention of the security director and the deputy warden." Dkt. No. 93 at ¶10. In addition, the defendants state that Schrubbe also testified that the specific incident she was discussing—the plaintiff being out of medication concerning one inmate complaint—was partially the fault of the security staff. Id. The defendants dispute that the medication lapse was solely the security staff's fault, because Schrubbe also testified when addressing the same incident, "Inmate Howard has repeatedly been instructed to contact HSU at once when he is out of medication. It appears he does not do this despite his claims to the contrary. There is no verifiable communication from Howard that he cannot sleep and has stomach aches or headaches." Dkt. No. 93 at ¶10.

Schrubbe testified that she requested increased staffing or a policy change from the BHS to remedy the medication problems. Dkt. No. 85 at ¶11. The BHS defendants (Greer, Burnett, Holzmacher) acknowledge the existence of emails between them and Schrubbe "discussing the general medication delivery process and issues pertaining to the Plaintiff." Id. at ¶12.

### 2. *Defendant Strahota*

In 2006, defendant Strahota received a copy of an affirmed medication complaint, which stated:

> The medication log cannot be an accurate reflection of the medication delivery [ ] recommendation is made to affirm with copies of the file sent to HSM Schrubbe and Security Director Strahota for review of the discrepancy in the medication log.

18

Dkt. No. 85 at ¶13.

In March 2007, the plaintiff's inmate complaint was affirmed, and the reviewing authority stated:

> This is affirmed because the patient was not provided with his medication per procedure. They recorded on the medication record the words out, instead of checking further to see where the medication was. HSU had recorded medication was sent and eventually the blisterpack was found on the unit. The modification is that the security review procedures relating to medication.

Dkt. No. 85 at ¶15. A copy was sent to Strahota "for follow-up regarding the clear discrepancy in records and the claim that medication ran out before the supply was supposed to be exhausted." Id.

Strahota received a copy of complaint WCI-2008-11595 in June of 2008; the complaint report states:

> Patient was sent a card of 30 pills of Paroxetine on 3-16-08. According to the medication record, officers wrote out on the night of 3-22-08. [ ] Copy to Security Director Strahota for reference regarding staff actions when medication is not available in the housing unit.

Dkt. No. 85 at ¶18.

Strahota was copied on the plaintiff's complaint WCI-2008-30097; the complaint report states:

> Noting the chronic history of this type of complaint from [the plaintiff], whereas he has submitted approximately 17 complaints claiming he did not receive meds or refills, etc. [ ] A copy of the complaint will be sent to HSM Schrubbe and to Security Director Strahota for reference with respect to the on-going problems[.]

Dkt. No. 85 at ¶20.

19

In February 2009, Strahota was copied on complaint WCI-2009-3006; the complaint report states in part:

> Approximately 18 of [the plaintiff's] ICRS submissions at WCI allege medication was not delivered timely, that the supply had run out, a combination of the two scenarios. [The plaintiff] has repeatedly been instructed to contact HSU at once when he is out of medication; it appears he does not do this despite his claims to the contrary. There is no verifiable communication from [the plaintiff] to HSU that he cannot sleep and has stomachaches or headaches.
>
> The medical and security variables encompassing this issue are beyond the purview of the ICRS. As such, a copy of the complaint will [be] sent to HSM Schrubbe and Security Director Strahota for follow-up on the medication delivery issue referenced above.

Dkt. No. 85 at ¶23; Dkt. No. 85-1 at 151.

In July 2009, defendant Strahota was copied on complaint WCI-2009-14719; the complaint report states:

> HSM Schrubbe has reviewed the matter and states, "According [to] patient's medication record, the Paroxetine was not available on the 24th. HSU did receive request from patient on 6/25/09 and HSU sent the medication out. Patient was seen by psychiatrist on 7-9-09 and patient did not mention any concerns about missing medication and withdrawal symptoms. HSM has brought the issue of security not requesting refills timely to the attention of Security Director and Deputy Warden as of a week ago. This issue is being addressed with cell hall sergeants."
>
> From an ICRS standpoint, nothing can be recommended as a remedy to this matter over and above what actions have already been taken according to the statement from HSM Schrubbe. I will opine, however, this is a consistent problem with [the plaintiff's] medications, and prior ICRS actions have suggested that, considering that [the plaintiff's] chronic problems with medication refills and delivery, a more specific tracking system should be developed for all aspects of [the plaintiff's] medication needs. A copy of the complaint will be sent to HSM Schrubbe, Deputy Warden Meisner and to Security Director Strahota for follow-up actions deemed necessary.

Dkt. No. 85 at ¶25; Dkt. No. 85-1 at 153.

20

When asked to admit that no further training or remedial action was taken in response to above-referenced inmate complaints, the defendants acknowledged that they had disclosed copies of the complaints during discovery but stated that they lacked sufficient knowledge or information to be able to admit or deny whether any action was taken in response to the complaints. Dkt. No. 85 at ¶¶16, 19, 21, 24, 26.

### 3.  *Defendant Meli*

On September 29, 2011, an officer skipped the plaintiff's cell during night med pass and when the plaintiff told him during count that he still needed his meds, the officer made a flippant comment and never returned. Dkt. No. 85 at ¶29. The plaintiff submitted complaint WCI-2011-21299, and the institution complaint examiner's report stated:

> Considering the above information, recommendation is made to affirm the complaint to acknowledge the missed HS dose of medication. Modification, however, is for further investigation by Capt. Meli and Capt. Bauer with respect to determining the identity of the staff member in question and determining the cause of the missed HS dosage of medication.

Dkt. No. 85 at ¶29.

In February 2012, both Strahota and Meli were copied on the plaintiff's complaint WCI-2012-1663; the complaint report states:

> Considering the medication was clearly not available, recommendation is made to affirm the complaint to acknowledge this. The side-affect [sic] claims can neither be addressed by the ICE or HSM Schrubbe as they were never reported prior to this submission. . . . Copies will also be sent to Warden Pollard, Deputy Warden Strahota and Security Director Meli in light of the fact an entire card of medication remains missing as well as to prompt review the medication delivery and documentation process.

Dkt. No. 85 at ¶31; Dkt. No. 85-1 at 160. In reference to the side-effects not being able to be addressed, the complaint report also states, "[The plaintiff] did not nor has he since the outage began on 1/12/12 contacted HSU to report the symptoms he alleges in the complaint." Dkt. No. 93 at ¶31. The report also reflects that the plaintiff's medication ran out on January 11, 2012, but that the plaintiff did not contact anyone until at least January 16, 2012. Id. The plaintiff then received his medication on January 24, 2012, took the medication that day, and then did not take the medication again for the following seven days until the time the inmate complaint was written. Id.

In December 2012, both Strahota and Meli were copied for complaint WCI-2012-24155, for which the complaint report states:

> According to medication record, patient did not receive his Fluoxetine the 1st thru the 13. HSU did send a card of 30 out on 10-01-12 and of 60 again on 10-13-12.
>
> Though the record does show he was out of one medication for two weeks, it is not known why [the plaintiff] did not tell anyone, write HSU, or file a complaint during the period he was out. He does not elaborate on this nor does he even state what medication was out in the context of the complaint. [The plaintiff] first submitted this complaint a week after the problem was resolved. It is not known what remedial action he desires given the fact none was possible by the time the complaint was received. The bottom line is HSU cannot correct a problem or address a concern if they do not know it exists.

Dkt. No. 85 at ¶33; Dkt. No. 93 at ¶33.

In July 2014, Meli was copied for complaint WCI-2014-12701; the complaint report states:

> Patient did not receive his medication, according to medication/treatment record in 6-13 pm through 6-17 pm. Security staff did not attempt to contact HSU via phone to inquire about refill. Per policy, security are to notify HSU when there is no medication

22

on hand to deliver . . . . any corrective measure through the ICRS is impossible because the complaint arrived 10 days after the final outage. No other remedy is needed considering [the plaintiff] does not state he suffered ill-effects from the outage.

Dkt. No. 85 at ¶37; Dkt. No. 93 at ¶37.

In November 2015, a copy of complaint WCI-2015-8426 was sent to Meli for "informational and instructional purposes with Unit Staff regarding the need for proper documentation on the Medication Treatment Record." Dkt. No. 85 at ¶41. In the inmate complaint, which the plaintiff submitted on May 8, 2015, he stated that his medication was unavailable from April 1, 2015 to April 4, 2015. Dkt. No. 93 at ¶41.

In December 2015, Meli received a copy of the report on complaint WCI-2015-8629 "for informational purposes and follow-up with Security Staff regarding the need for proper and accurate documentation with regard to medication administration." Dkt. No. 85 at ¶43. The HSU Manager stated in response to complaint '8629, "'[t]here are several months and various medications that are also not initialed properly . . . ." Id. at ¶44.

In September 2015, in response to complaint WCI-2015-13147, HSU Manager Scarpita informed the institution complaint examiner that Meli had initiated "a weekly audit of medication sheets to ensure accuracy and compliance." Dkt. No. 85 at ¶46. When the corrections complaint examiner reviewed complaint '13147, he or she found that for the date in question the column was void of the codes that officers were required to use and that while HSU had sent the necessary amount of medication for the month to the unit, it

was not made available to the plaintiff. Id. at ¶47. A copy of the decision was forwarded to Meli. Id.

In June 2016, Meli was copied on complaint WCI-2016-13971, where it was determined that the plaintiff's medications had been sent to the unit but not delivered to him for several days and that there were errors in the medication log. Dkt. No. 85 at ¶51. The inmate complaint report for WCI-2016-13971 states in part:

> In discussing this issue with the Warden, the institution has implemented a process of checks and balances in order to ensure staff are processing and documenting medication pass. This process includes participation from line staff, security supervisors, and the HSU Manager.
>
> In coming to this determination, the Examiner relied upon the responses, documentation and professional judgment of the health care staff as noted above. Examiner recommends that the appeal be dismissed with the modification a copy be provided to the Deputy Warden, Security Director and HSU Manager for informational purposes.

Dkt. No. 85 at ¶51; Dkt. No. 85-1 at 179.

In the decision for complaint WCI-2016-25502, the institution complaint examiner stated, "HSU has determined there should not have been an outage of the medication based upon the delivery date of the prior card . . . [the plaintiff] cites no adverse effect from the alleged missed dose . . . " Dkt. No. 85 at ¶52; Dkt. No. 93 at ¶52. A copy was sent to Meli in November of 2016 "in order to determine the cause of this reoccurring claim [ ] with the goal of eliminating the circumstances that appear to give rise to the claims." Id.

In February 2017, Meli received a copy of complaint WCI-2017-316 in which the plaintiff alleged he missed a half dose of Bupropion. Dkt. No. 85 at ¶54; Dkt. No. 93 at ¶54. The complaint report states:

> HSU has determined there should not have been an outage of the medication based on the delivery date of the prior card. [The plaintiff] cites no adverse effect from the alleged missed 1/2 dose.
>
> . . .
>
> [T]he issue was addressed by HSU when they learned of it. What I do not see is that [the plaintiff] talked to his unit Sergeant about the problem.
>
> . . .
>
> It is recommended HSU conduct an evaluation of the matter in conjunction with Security Director Meli in order to determine the cause of this recurring claim made by [the plaintiff] with the goal of eliminating the circumstances that appear to give rise to the claims.

Dkt. No. 93 at ¶54; Dkt. No. 85-1 at 189.

In March 2017, Meli was sent a copy of complaint WCI-2017-4015 for review, "considering there should have been no shortage." Dkt. No. 85 at ¶57. Complaint WCI-2017-4015 alleged the plaintiff missed one day of Fluoxetine on January 20, 2017. The complaint report states in part:

> Recommendation is made to affirm to acknowledge the medication Fluoxetine was marked unavailable on 1/20/17. No adversity is cited. Modification is that a copy of the complaint be sent to Security Director Meli and to Asst. HSM White for review of this matter, considering there should have been no shortage.

Dkt. No. 93 at ¶57; Dkt. 185-1 at 192.

Regarding the above-referenced complaints, the defendants stated either that they lacked sufficient knowledge to be able to admit or deny that Meli took action in response to the complaint, dkt. no. 85 at ¶¶29, 32, 34, or that Meli

25

denied that he failed to take action in response to the complaint and he referenced his declaration (which, the plaintiff asserts, does not provide specific action taken in response to any specific complaint), id. at ¶¶38, 42, 45, 50, 53, 55, 58.

Meli received a copy of a complaint report in November 2017 for complaint WCI-2017-19915; the corrections complaint examiner found that "[d]ue to the incomplete MAR's [med logs] it can not be determined why there are gaps in the record" and "clearly there is a need to address staff failure to comply with the MAR completion." Dkt. No. 85 at ¶59. In complaint '19915, the plaintiff alleged his Fluoxetine ran out on July 27, 2017; the complaint report on the complaint states:

> HSM Marchant has reviewed the claims in the complaint and has weighed them against pertinent records. She reports, "After reviewing patient's complaint and medication profile, our med profile shows that his fluoxetine was sent out on 7/30/17 and it was two cards of 60 tabs. Also I note that officers received a card on 7/3/17 of a card of 60 tabs which would only give patient a 20 day supply meaning patient would have ran out of medication on 7/23/17 if he was taking the medication correctly and patient did not submit refill form until 7/30/17. Prior to July patient's last time he ordered a card of fluoxetine was on 5/30/17, which a card of 60 tabs was sent on 5/30/17 which again was only a 20 day supply. So after reviewing patients med card it appears patient is not taking the medication as prescribed and did not follow the process of placing in a med refill form 7 days prior to being out of his medication.
>
> No adverse effect is relayed in the complaint. [The plaintiff] has been continuously advised by HSU via the submission of complaints regarding the importance of requesting refills in a timely manner. Now, HSM Marchant reports the medication is out far before the refill request. Recommendation is made to dismiss with modification. [The plaintiff's] current medications should be reviewed from a necessity point considering the willful lapse in refill requests.

Dkt. No. 93 at ¶59; Dkt. No. 85-1 at 195. According to the defendants, the reviewing authority then stated, "The patient must take the responsibility to assuring his medications are properly reordered by policy. In addition, the staff need to address the importance of taking the medications as they are ordered for them to be effective." Dkt. No. 93 at ¶59; Dkt. No. 85-1 at 195. On appeal, the corrections complaint examiner determined:

> While HSU has records of sending the medication to the units and this inmate's request for refills, the Medication Administration Records (MAR) are not complete. Due to the incomplete MAR's it can not be determined why there are gaps in the record. This inmate's assertions cannot be confirmed but clearly there is a need to address staff failure to comply with the MAR completion.

Dkt. No. 93 at ¶59; Dkt. No. 85-1 at 196.

### 4. *Training*

DAI Policy 500.80.26, which addresses the non-adherence of controlled medication, states that when a correctional officer is delivering medication, "non-adherence" includes an incarcerated individual refusing to take his daily medication on three consecutive days or three consecutive doses of a medication taken more than once a day or refusal to take more than fifty percent or more doses of a medication over the period of a week. Dkt. No. 85 at ¶73. When this occurs, the officer is to notify HSU of the refusal and upon notification, the nurse shall determine the urgency and schedule an appointment to educate the incarcerated person; if he still does not wish to take the medication he will be provided with a refusal form to sign, which is then forwarded to the prescriber for review as to whether the medication should be canceled. Id.

When asked about the procedure at Waupun when an incarcerated individual refuses his medication, Schrubbe testified that if "the inmate is refusing several days in a row, [the officers] need to notify HSU of that." Dkt. No. 85 at ¶74. When asked again about the procedure when there is non-adherence, Schrubbe stated that HSU would follow up with the incarcerated individual to discuss his refusal. Id. When asked about whether she conducted training for the officers on medication delivery, Schrubbe testified that "they got that training through security, not through me." Id. at ¶75.

C.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

28

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4)

D.    Discussion

The defendants contend that they did not act with deliberate indifference to the plaintiff's serious medical needs. Dkt. No. 71 at 17. They argue that no defendant had the authority or ability to do what the plaintiff wanted, which was to change DAI policy and require nursing staff to handle and deliver all medication for incarcerated individuals at Waupun. Id. The defendants assert that every defendant believed the medication delivery process by correctional officers was proper and effective, and that the plaintiff never faced any risk to his safety because of the medication delivery process. Id. at 23. According to the defendants, even if they concede for summary judgment purposes that the plaintiff missing medication doses constituted a serious medical need, the plaintiff cannot show that any defendant acted with deliberate indifference. Id. at 20-21. The defendants also contend that they are entitled to qualified immunity. Id. at 23.

The plaintiff responds that the defendants acted with deliberate indifference to his serious medical needs. Dkt. No. 84 at 5. He asserts that correctional staff—not his refusal of medication—caused the medication lapses.

29

Id. at 5-6. The plaintiff also argues that delayed refills accounted for less than twelve percent of the total medication lapses.[10] Id. He contends that his medication records create a factual dispute regarding the cause of the outages and he maintains that the defendants' assertion of a non-existent policy that medications must be returned to the HSU after being refused for five days is a "flimsy and spurious excuse" from which a jury could infer guilt. Id. at 7-8.

The Eighth Amendment to the United States Constitution imposes a duty on prison officials to "provide humane conditions of confinement," which includes ensuring that incarcerated individuals "receive adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994). To succeed on a claim that a prison official provided constitutionally deficient medical care, an incarcerated individual "must prove that he 'suffered from an objectively serious medical condition' and that the defendant was 'deliberately indifferent to that condition.'" Davis v. Kayira, 938 F.3d 910, 914 (7th Cir. 2019) (citation omitted).

A medical condition is objectively serious if it "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would perceive the need for a doctor's attention." Greeno v. Daley, 414 F.3d

---

[10] The plaintiff states that while at Waupun, he was prescribed a total of 33,073 doses, or individual pills and that of those, he missed 504 doses due to delayed refills and 3,738 due to the errors of the cell hall correctional officers tasked with delivering his medication. Dkt. No. 85 at ¶3. As the court explained above in the Plaintiff's Facts section, however, the plaintiff has not cited to evidence in support of his proposed facts regarding the number of medication doses he says he missed between 2004 and 2017. See supra. at n.9; see also Dkt. No. 93 at ¶3.

30

645, 653 (7th Cir. 2005). The defendants assume, for the purpose of summary judgment, that the plaintiff had a serious medical need; their brief focuses on their arguments that they did not act with deliberate indifference.

The second prong of an Eighth Amendment medical care claim is the "deliberate-indifference standard," which "requires a 'sufficiently culpable state of mind.'" Davis, 938 F.3d at 914 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). A plaintiff does not need to show that the official intended harm or believed that harm would occur for a prison official's acts or omissions to constitute deliberate indifference. Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016). But showing mere negligence is not enough. Id. (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). Likewise, objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim. Id. (citing Farmer, 511 U.S. at 836-38).

To prove subjective culpability, "a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." Id. (emphasis in original). "Officials can avoid liability by proving they were unaware even of an obvious risk to inmate health or safety." Id. (citing Farmer, 511 U.S. at 844). To establish deliberate indifference, the plaintiff must present evidence that an individual defendant intentionally disregarded the known risk to his health or safety. Collins v. Seeman, 462 F.3d 757, 762 (7th Cir. 2006) (citation omitted). A defendant with knowledge of a risk need not "take perfect

31

action or even reasonable action[,] . . . his action must be reckless before § 1983 liability can be found." Id. (citation omitted).

When the court screened the plaintiff's third amended complaint, it determined that the defendants' alleged lack of action regarding the policy that allegedly caused the abrupt unavailability of the plaintiff's medication *could* amount to deliberate indifference, if the defendants knew about the plaintiff's medical needs yet "turned a blind eye" to the policy that caused the unavailability of his medication. Dkt. No. 53 at 29 (citing Perez v. Fenoglio, 792 F.3d 768, 782 (7th Cir. 2015); Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001). At the summary judgment stage, the record shows that the defendants did not act with deliberate indifference because they did not have the ability to change the medication distribution policy. In addition, the record does not support a finding that defendants Strahota and Meli knowingly disregarded a substantial risk to the plaintiff's health or safety and therefore they did not act with deliberate indifference to the plaintiff's medical needs.

1. *BHS Defendants: Greer, Burnett and Holzmacher*

The court allowed the plaintiff to proceed on his claim that Greer, Burnett and Holzmacher failed to change Waupun's policy of having correctional officers distribute medication despite being aware of the dangers of using correctional staff to distribute medication and maintain medication logs as well as the ongoing problem at Waupun with the plaintiff. Dkt. No. 53 at 31.

It is undisputed that although Greer could recommend new policies to the secretary of the DOC, the BHS defendants did not have the authority to

32

change the medication delivery policy at Waupun. The legislature had the final authority in creating policies and procedures. Because the BHS defendants lacked authority to change the policy, they cannot be liable for the plaintiff's claim against them. See Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."); see also Miller v Harbaugh, 698 F.3d 956, 962 (7th Cir. 2012) ("[D]efendants cannot be [held liable under the Eighth Amendment] if the remedial step was not within their power"); Martin v. Adams, No. 22-CV-42, 2023 WL 6538560, at *6 (W.D. Wis. Oct. 6, 2023) (citing Alexander v. Richter, 756 F. App'x 611, 614-15 (7th Cir. 2018) (defendants entitled to summary judgment on claim regarding staffing where plaintiff failed to present evidence that defendants had the authority to increase optometrists' hours at the prison in response to delays in eye care).

The plaintiff contends that BHS defendants should have taken action because Schrubbe emailed them asking for increased staffing or a policy change. Although the BHS defendants lacked authority to change the policy and/or authorize the hiring of nurses to distribute medication to incarcerated individuals, it is undisputed that defendant Greer sought approval for additional healthcare staff and requested additional funding so HSU could hire more nursing staff. And in 2019, after the plaintiff had left Waupun, Greer helped implement the electronic medical record system there, which improved the medication delivery process and minimized mistakes.

It is undisputed that Greer continuously monitored inmate complaints at each institution to see how processes could be improved. Most of the complaints related to an incarcerated person not being seen by HSU in a timely manner, being charged a copay or not receiving the medical care he thought he should receive. The plaintiff contends that Greer should be liable because the plaintiff requested improvements to the medication delivery system while incarcerated at Waupun, and his requests show that the system was deficient. But the fact that Greer monitored systems at DOC institutions and sought to improve them does not mean that the medication delivery system at Waupun was constitutionally deficient.

Defendants Greer, Burnett and Holzmacher lacked authority to change the medication distribution policy at Waupun. They were not deliberately indifferent to the plaintiff's serious medical needs.

### 2. *Waupun Defendants: Strahota and Meli*

The court allowed the plaintiff to proceed on an Eighth Amendment claim against defendants Strahota and Meli based on their alleged failure to address problems with Waupun's medication delivery system that would have reduced the number of missed medications. Dkt. No. 53 at 37-38.

The defendants contend that Strahota and Meli did not act with deliberate indifference to the plaintiff's medical needs. They argue that while Strahota and Meli would have been aware that the plaintiff occasionally complained about missing medication doses, they also took action to accommodate the plaintiff, including investigating complaints and having staff

34

follow up with the correctional officers and HSU. Dkt. No. 71 at 22. According to the defendants, Meli and Strahota were not aware of any widespread issue with Waupun's medication delivery and were aware that the plaintiff was refusing to take his medication at times and was non-compliant with the medication refill system and health service request procedures. Id.

The plaintiff contends that "the most damning evidence weighing against [Strahota and Meli] is their lack of any documentary proof of their alleged reaction to the repeated complaints sent to them." Dkt. No. 84 at 8. The plaintiff states that Strahota and Meli did not, and cannot, provide one piece of paper proving that they even communicated with a subordinate about the problem. Id. According to the plaintiff, between 2006 and 2009, defendant Strahota, while he was Waupun's security director, had a least six complaints referred to him so that he could refer the matter and follow up as needed to remedy the problem. Id. at 9. The plaintiff says that Strahota offers no explanation or even a vague memory about what he did in response to six separate complaints being sent to him over a three-year period, and he also didn't do anything after the issue was brought to him twice in 2012, when he was deputy warden. Id. Regarding Meli, the plaintiff asserts that Meli received complaints over a six-year period (2011-2017) and was given the opportunity to address the medication delivery problem fourteen times. Id. at 10. For some of these, Meli says he lacks knowledge and for others he refers to his declaration which does not reference a specific response to any specific complaint or situation. Id. The plaintiff acknowledges that Meli says that at some point he

35

had his subordinates conduct weekly reviews of the medication logs to ensure they were being filled out correctly. Id. The plaintiff contends that Strahota and Meli easily could have addressed the problem by enforcing two simple aspects of Division of Adult Institutions policy already in effect: make sure officers correctly fill out the med logs and if the records show that they are supposed to administer medication and they do not have it, contact HSU.[11] Id. at 10-11.

The plaintiff states that between 2002 and 2017, while he was incarcerated at Waupun, he submitted eighty-eight medication-related inmate complaints. The plaintiff's claims against Strahota and Meli relate to inmate complaints he submitted between 2006 and 2017. The reports from these complaints show that there was a problem with the plaintiff not receiving his medication but that the plaintiff was partly at fault for the problem. See Dkt. No. 85-1 at 13 ("[The plaintiff] has repeatedly been instructed to contact HSU at once when he is out of medication; it appears he does not do this despite his claims to the contrary."); Dkt. No. 93 at ¶31 (plaintiff's medication ran out on January 11, 2012, and he didn't contact anyone until at least January 16, 2012; plaintiff then received his medication on January 24, 2012, took the medication that day, and then did not take the medication again for the following seven days until the time the inmate complaint was written); Dkt.

---

[11] The parties dispute who was responsible for training correctional officers to dispense medication. According to the defendants, HSU was responsible for the training. According to the plaintiff, HSU Manager Schrubbe testified that security was responsible for the training. It appears undisputed that neither defendant Strahota or Meli conducted the training. In any event, the dispute over who trained correctional officers is not material.

Nos. 85 and 93 at ¶33 (plaintiff out of one medication for two weeks but did not tell anyone, write HSU or file complaint during the period he was out); Dkt. No. 93 at ¶59 (it appears that plaintiff is not taking the medication as prescribed and did not follow the process of placing in a med refill form seven days prior to being out of his medication; plaintiff has been "continuously advised by HSU" about the importance of requesting refills in a timely manner; "[the plaintiff's] current medications should be reviewed from a necessity point considering the willful lapse in refill requests.").

Waupun's HSU took steps to educate the plaintiff about how he could avoid missing medication doses, including timely filling out refill requests and submitting health service requests when he missed any doses, but the record shows that the plaintiff repeatedly ignored the HSU guidance. He would file inmate complaints instead of health service requests, which was not the way to get medication refills. According to Schrubbe, of the thousands of incarcerated individuals that HSU staff served during the years she worked at Waupun, the plaintiff was the only person who consistently had issues with medication delivery, despite Waupun staff taking measures to accommodate him specifically. The plaintiff also periodically refused to take his medication.

In addition to the plaintiff not reporting to HSU when he missed his medication and not timely submitting refill requests, reports regarding his inmate complaints do not show that he suffered adverse effects from missing medication. See Dkt. No. 85-1 at 151 ("no verifiable communication from [the plaintiff] to HSU that he cannot sleep and has stomachaches or headaches");

Dkt. No. 85 at ¶31; Dkt. No. 93 at ¶31 (side effect claims cannot be addressed because plaintiff did not report them to HSU before filing inmate complaint); Dkt. No. 85 at ¶37; Dkt. No. 93 at ¶37 (plaintiff did not state he suffered ill effects from four-day medication outage); Dkt. No. 85 at ¶52; Dkt. No. 93 at ¶52 (plaintiff cites no adverse effect from missing dose of medication); Dkt. No. 85 at ¶54; Dkt. No. 93 at ¶54 (plaintiff cites no adverse effect from missing half-dose of medication); Dkt. No. 85 at ¶57; Dkt. No. 93 at ¶57 (no adversity cited from missing one day of medication); Dkt. No. 85 at ¶59; Dkt. No. 93 at ¶59 (no adverse effect reported in complaint from missing medication).

The plaintiff acknowledges that in 2015, Meli did initiate a weekly audit of the plaintiff's medications to ensure accuracy and compliance. But he contends that Strahota and Meli did not take any other action in response to his inmate complaints because they have not submitted evidence supporting their assertion that they would have followed up with staff about an inmate complaint. Strahota and Meli assert that when the warden assigned them inmate complaints regarding medication delivery, they would direct a supervisor in the cell hall to investigate the complaint and report back to them. After reviewing the findings, Strahota or Meli would direct the supervisor to follow up with the staff to correct the issue and/or follow up with the warden. Strahota and Meli deny not taking any action in response to the plaintiff's inmate complaints and the procedures they describe do not necessarily involve documentary evidence, as the plaintiff contends.

38

Even if Strahota or Meli did not take action in response to a particular inmate complaint on which they were copied and on which the institution compliant examiner recommended that they follow up with appropriate staff on medication delivery policy, their failure to do so would not amount to a constitution violation. First, the parameters of the Eighth Amendment are not determined by state law, prison polices or the inmate complaint system. See Rasho v. Jeffreys, 22 F.4th 703, 711, 713 (7th Cir. 2022); Scott v. Edinburg, 346 F.3d 752, 760 (7th Cir. 2003). Second, the record does not support a finding that Strahota and Meli knew the plaintiff was at risk of harm from missing medication. As explained above, while there was an ongoing problem with the plaintiff receiving his medication, he periodically refused medication and he failed to follow directions to receive his medication. Instead of notifying HSU that he had not received his medication, the plaintiff would wait until multiple days passed, then submit an inmate complaint about not receiving medication. The plaintiff's inmate complaints do not allege that he suffered adverse effects from missing his medication. Based on this record, the plaintiff has not demonstrated that Meli and Strahota would have been aware that he was at risk of harm from missing his medication. Therefore, they did not display deliberate indifference. See Davis, 938 F.3d at 914; Collins, 452 F.3d at 762.

A reasonable factfinder could not conclude that the defendants violated the plaintiff's rights under the Eighth Amendment. The court will grant the defendants' motion for summary judgment.

39

Because the court is granting the defendants' motion for summary judgment on the merits, it will not address their claim that they are entitled to qualified immunity.

**III.    Conclusion**

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 64.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

40

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 21st day of October, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

41